**FURMAN v. GULF INS. CO. OF DALLAS, TEX. et al.**

No. 12982.

Circuit Court of Appeals, Eighth Circuit.

Jan. 10, 1946.

892

Lee A. Hall, of St. Louis, Mo., for appellant.

Chelsea O. Inman, of St. Louis, Mo. (Wilbur C. Schwartz, of St. Louis, Mo., on the brief), for appellees.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

An agent sued two insurance companies in damages under Missouri law for the value of his agency and business in the city of St. Louis, which he claimed that through duress they had caused him to transfer to a third person without consideration. The trial court directed a verdict for the companies at the close of the agent's evidence, and the agent has appealed. The primary question is whether there was any submissible evidence of duress as the case stood at the time. A summary of the agent's evidence follows.

His agency had been a going business for 10 years and was producing a net annual income of around $10,000. It had a commercial value of $20,000-$25,000. He represented two other companies besides the defendants. His agency contract with defendants (which were affiliated compa-

nies, one fire and the other casualty) was made in 1934. At that time he was somewhat financially embarrassed, because in the three preceding years some other companies that he had been representing had failed and he had attempted to protect his policyholders by rewriting their policies and standing the unearned premiums which amounted to $6,000-$7,000. The defendants knew this situation when they appointed him as their agent. For the first three or four months of his contract, he made remittances currently to the defendants on the business he wrote, but then he began to get in arrears. By July 1936, his delinquencies amounted to $1,980, for which the defendants at that time took his note payable in monthly instalments. He continued to be delinquent in making payment of his premiums, and by October 1937 he was in arrears $5,488.44, in addition to the unpaid balance on his previous note. Up to that time the companies had not pressed him but had accepted his irregular remittances as they were made.

About that time the companies began to make complaint. The state agent told him that they were dissatisfied with the way he was remitting. In December 1937, he received a telephone call from the home office of the companies advising him that something would have to be done about the accumulated delinquencies. In January 1938, the state agent came to his office with a man named Fischer, an agent for the companies at Staunton, Illinois, and, after again voicing the companies' dissatisfaction with the situation, informed him that Fischer was willing to put some money into the business. He resented the attempt to make Fischer a part of his business and threatened to complain to the home office about the state agent's actions.

On February 1, 1938, the state agent called him by telephone and asked him to come to a room in one of the St. Louis hotels, where he met a vice-president of the companies. The vice-president inquired whether he was able to make any further payment on his delinquencies. When he answered that he was not, the vice-president stated, "Well, in that case I think you had better turn your business over to Mr. Fischer." He protested and a discussion followed. Finally, the vice-president jumped to his feet and shouted, "We are through." Fischer then came into the room, and the vice-president suggested that they have lunch together. The agent

asked to be excused, but the vice-president replied, "No, that won't do"; that he (the vice-president) didn't have a lot of time to spend in St. Louis; that they would have lunch together; and that they would then return to the room. After lunch, they resumed their discussion. The meeting lasted until 5 o'clock P. M. The agent repeated that he did not want to turn over his business to Fischer. The vice-president finally declared, "I think, Mr. Furman, you had better turn your business over to Mr. Fischer." By that time the agent said, "All right, bring Mr. Fischer up to the office." They then adjourned, and the vice-president directed the agent to return the following morning.

Before going to the hotel the next day, the agent consulted a lawyer as to the possibility of getting 60 or 90 days further time. He arrived at the hotel about 10 o'clock A. M., and the vice-president was in a rage. The agent suggested that he ought not to be blamed for trying to save his business, whereupon the vice-president shouted: "You haven't got any business. The [companies] own your business, and if you don't consent to it being turned over to Mr. Fischer, we won't give you a clean bill of health." According to the agent's testimony, not-to-give-a-clean-bill-of-health is a technical expression in the insurance business that invariably means that a company will cancel out an agent's policies and then undertake to rewrite them direct (implying notice to the policyholder of the agent's failure to pay the premium as the cancellation reason).

When the vice-president stated that the companies would refuse to give him a clean bill of health, the agent became quite ill. He testified, "I just couldn't think." He sought to be excused from the conference, but the vice-president said: "Nothing doing. If you are too sick to remain here at the hotel room, we will go out to your home." The vice-president insisted, "You turn your business over to Mr. Fischer right now." According to the agent's testimony, "I just broke down and said, 'I'll do it.'" The vice-president then undertook to dictate an agreement to some one over the telephone. The agent suggested that he be allowed to go after the document, but the vice-president replied: "No, you don't. If you want to get outside, Ed Fischer, you go with him." Fischer accompanied the agent and they returned with the agreement. The vice-pres-

ident and the agent then both executed the instrument, after which the agent was excused until the following morning. At that time he turned his office and records over to Fischer, but, according to his testimony, he "was not all right mentally for several weeks."

The agreement itself is not in evidence. The agent was permitted to testify, without objection so far as the printed record indicates, that he signed the agreement and turned over his business without any consideration; that "there never was any agreement to take over my obligations to the defendants"; and that nothing was said in connection with the agreement "about forbearance by defendants in the collection of premiums due them." He admitted that Fischer gave him a job in the office at $150 per month, which he held for a period of 13 months, but he said that this arrangement was not part of the agreement and was made afterwards, with the implication that it was a personal arrangement as much for Fischer's benefit as his own and in any event was not a contractual consideration for the transfer of his agency. He further admitted on cross-examination that he had testified in a previous deposition that the day after the agreement was signed the vice-president had said to him, "Mr. Furman, you don't owe the [companies] a penny," but he declared that there had not been any such promise or understanding in connection with or as a consideration for the transfer of the agency. The narrative of his cross-examination in the printed record also contains a naked statement by him that "I got rid of about $7,000 liabilities by the Fischer deal," but there is no amplification of what was meant, and the question to which the answer was made does not appear.

█ A jury might (and perhaps normally would) accept these last two statements as implying that there had been a consideration for the agreement, but as they abstractly stood they could not be held to require such an import as a matter of law, in view of the agent's other specific testimony that there was no promise or understanding in connection with the agreement as to any forbearance or release of his obligations to the defendants and no other consideration for the transfer, and that the remark of the vice-president as to his not owing the companies anything was first made the day following the execution of the agreement, so that it was legally

894

possible for the companies to have undertaken to write off the agent's liabilities by subsequent voluntary act rather than as a matter of previous contractual obligation, in a retrospective attempt to cure any existing defect of lack of consideration for the transfer of the agency.

■ But, whatever the facts may prove to be when the written agreement and the full evidence of the parties shall have been brought before the court, even if it should conclusively appear that the transfer of the agency had as its consideration the release of the agent from payment of his delinquencies, this would not affect the agent's right to maintain the present action (except in the amount of his recovery), if the transfer of the agency was obtained by duress and the agency was worth $20,-000–$25,000.

■ Modern view has gradually extended the boundaries of the field of duress and of the right to relief therefor. The obtaining of a transfer of any form of property by duress is now recognized as tortious. Restatement, Torts, § 871, Comment f. This is the rule in Missouri. White v. McCoy Land Co., 229 Mo.App. 1019, 1039, 1040, 87 S.W.2d 672, 684. As to personal property, relief ordinarily may be sought for duress by an action at law for damages. Restatement, Torts, § 871, Comment c.

■ In general terms, duress is the domination of another's will to his detriment by means or under circumstances that make the particular transaction wrongful against him. Cf. Wood v. Kansas City Home Telephone Co., 223 Mo. 537, 558, 559, 123 S.W. 6, 12; Winget v. Rockwood, 8 Cir., 69 F.2d 326, 329, 330; Restatement, Torts, § 871, Comment f. Some states, including Missouri, have recognized the broad doctrine of "business compulsion" in the field of duress. See 17 Am.Jur., Duress and Undue Influence, § 7; Annotation, 79 A. L.R. 655; White v. McCoy Land Co., 229 Mo.App. 1019, 1040, 87 S.W.2d 672, 685, affirmed sub. nom. White v. Scarritt, 341 Mo. 1004, 111 S.W.2d 18. In the still fluid state of that doctrine, we shall not attempt any crystallizing formulation of it here, since it is not necessary to do so for present purposes.

■ Whether the free will of a party has been so dominated in a particular transaction as to have controlled his action is ordinarily a question of fact, where it is possible under the evidence for there to have been a wrongful use of coercive means or circumstances. Cf. White v. McCoy Land Co., 229 Mo.App. 1019, 1039, 1040, 87 S.W.2d 672, 684; Winget v. Rockwood, 8 Cir., 69 F.2d 326, 330.

■ In holding that the present case ought not to have been taken from the jury at the close of the agent's evidence, it is sufficient here merely to point to one aspect of possible duress without purporting to comb the general situation. The companies could hardly legally as against the policyholders have undertaken to cancel the agent's policies for nonpayment of premiums, when they had paid the agent but he had failed to remit. The threat thus to cancel and so to expose to the policyholders the financial situation between the agent and the companies would therefore not be a proper means of obtaining a transfer of the agent's business, if that was how it was accomplished. Whether the agent's mind was controlled by this threat at the time he executed the contract would be a jury question as the evidence stood when the motion for a directed verdict was granted.

The companies argue that the vice-president's statement that the companies would not give the agent a clean bill of health if he refused to transfer his business to Fischer could not possibly be construed to mean that they would cancel out the agent's policies for his failure to pay the premiums and attempt to destroy his relations with his policyholders. But the agent testified that this was the technical and invariable meaning of the vice-president's expression in the insurance business, and on the present state of the record the jury would have been entitled to so find.

■ The companies further argue, however, that, even if the agent's evidence was sufficient to make a jury question on duress, the judgment should be affirmed on the ground that the record shows that the agent subsequently ratified the contract and hence had no legal right to attack it. It is contended that his acceptance of employment from Fischer was such a ratification. But, under the agent's testimony, the employment arrangement was not a part of the contract and it was undertaken by him, so he said, in an effort to preserve his relations with his policyholders. A jury might perhaps regard the act as evidence of his having ratified the transac-

tion, but it cannot be declared that his acceptance of such employment, which was not a contractual benefit, constituted a ratification of the contract as a matter of law. Similarly, the 3-years time that he has waited to bring the action is on the present record at most merely evidence of possible ratification and cannot without other estopping circumstances be declared to constitute a ratification as a matter of law.

The final argument is made that the agent has "accepted the beneficial relief from his indebtedness to defendants" and has "made no offer of restitution either before the institution of the suit or in his pleadings" and that there therefore has been a ratification of the agreement as a matter of law, and that in any event his failure to offer to restore the consideration would preclude a recovery under the general principles of rescission. The written agreement, as we have indicated, is not in evidence, and the agent's testimony, as we have emphasized, asserts that there was no promise or understanding of forbearance or release in connection with the agreement. But beyond this, if the companies did agree to release the agent from the payment of his delinquencies as the consideration for the transfer of his business, his repudiation of the agreement on the ground of duress, if successful, would necessarily automatically reinstate his obligation to the companies and so restore the status quo in the present situation. There was nothing that had come into the agent's hands that he could offer to turn back and nothing so far as the record indicates that would leave the companies in any different legal position with respect to the agent than they had previously occupied. The requirement in an action for restitution that the other party to the transaction should be placed in his original position exists to prevent enrichment by the rescinding party at the expense of the other and is limited by the reason for the rule. Restatement, Restitution, § 65, Comment e. The companies might properly ask to have the amount of the agent's obligation deducted from or offset against any recovery he might obtain, but they could hardly insist that he should clean up his delinquencies or offer to make concurrent payment of them as a condition precedent to his right to bring the present suit. That would be requiring more than a restoration of the status which existed at the time the agreement was made. And, of course, it has never been necessary in a complaint at law to make a mere formal offer to do general equity.

The judgment is reversed and the case is remanded for further proceedings.