## GLADSTONE YOUNG *v.* DATA SWITCH CORPORATION (14890)

PETERS, C. J., and BORDEN, NORCOTT, KATZ and PALMER, Js.

Argued June 2—decision released August 23, 1994

*Andrew J. McDonald,* with whom, on the brief, was *Michael N. LaVelle,* for the appellant (plaintiff).

*Neil W. Sutton,* for the appellee (defendant).

PETERS, C. J. In current economic conditions, corporate downsizing is often accomplished in part by offering severance agreements to corporate employ-

ees. The underlying issue in this case is whether a former employee, having retained the benefits conferred upon him by a severance agreement, may avoid that agreement on the ground of coercion for an indefinite period of time after the alleged coercion has ended. In specific procedural terms, the issue is whether the trial court abused its discretion in setting aside a jury verdict that awarded damages for wrongful termination to such an employee even though he had waited seventeen months before raising the issue of duress.

The plaintiff, Gladstone Young, brought an action for damages claiming that his employment had been wrongfully terminated by the defendant, Data Switch Corporation. In response to a special defense of release, the plaintiff alleged that he had a right to disaffirm, on the ground of duress, a severance agreement that he and the defendant had executed. A jury returned a general verdict for the plaintiff and awarded him $413,000 in damages. On the defendant's motion, the trial court set aside the jury verdict. The trial court concluded that the jury verdict could not be sustained because, as a matter of law, the plaintiff had ratified the severance agreement by retaining its benefits and delaying any objection to its validity until sixteen months[1] after the alleged coercion had entirely ceased.

The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The facts are essentially undisputed. The plaintiff is an electrical engineer who became an employee of the defendant in 1979. Toward the end of 1984, as a result

[1] The period of delay was actually seventeen months.

of financial difficulties, the defendant began to restructure its operations. No later than April 15, 1985, when the plaintiff was placed on a paid leave of absence, he became aware that his regular employment with the defendant was likely to end. At a subsequent meeting with the defendant's president on May 14, 1985, the plaintiff himself proposed that he be placed on half-salary for a two year period during which he would serve as a consultant to the defendant. While the defendant agreed to consider this proposal, the plaintiff continued on his paid leave of absence. During this leave of absence, the plaintiff explored new scientific opportunities that the defendant subsequently decided not to pursue.

On July 26, 1985, the defendant's president informed the plaintiff that his employment was being terminated. The plaintiff does not claim that this meeting or its message was in any respect coercive.

The plaintiff's claim of duress arises instead out of a subsequent letter, dated August 6, 1985, that contained the details of the severance plan that "[the defendant was] prepared to offer" him. That letter referred, in its opening words, to the plaintiff's having been on "leave effective April 15, 1985," and then offered to retain him on a paid leave of absence "through October 15, 1985, so that you may retain your right to exercise a significant amount of company stock options." The plaintiff had stock options that he would not have been able to exercise if his employment had been terminated on April 15, 1985, rather than on July 26, 1985, as he had expected.[2] Interpreting this letter as backdating his termination for all purposes, and therefore anticipating substantially adverse eco-

---

[2] Under the stock option plan, the plaintiff could exercise his vested options only while he was an employee of the defendant or within ninety days of the termination of his employment with the defendant.

nomic consequences, the plaintiff felt coerced, he alleges, into acquiescing in the severance agreement.[3]

At a meeting held on August 14, 1985, the plaintiff brought his interpretation of this part of the severance offer to the attention of the defendant's president and explained the importance of the stock options to him. The plaintiff himself testified that, in response, the defendant's president assured him that, if he signed the release, he would receive his stock.

On August 15, 1985, without voicing any further dissatisfaction with its terms, the plaintiff signed the severance agreement, thereby releasing the defendant from all liability arising out of the plaintiff's employment. On August 21, 1985, the plaintiff received the 40,000 shares to which he was entitled by virtue of his previous stock options,[4] and thereafter received the remainder of the benefits, including the right to exercise additional stock options, that were contained in the severance agreement.[5]

Subsequent to his execution of the severance agreement, the plaintiff had several further communications with the defendant. Although his first letters indicated

---

[3] On August 6, 1985, the plaintiff had exercised his stock options in 40,000 shares by sending a letter and a check in the amount of $33,200.76 to the defendant's president. The option prices and the share prices were such that the execution of the options on that date would have resulted in a net profit to the plaintiff of $167,000.

[4] The record does not indicate that the delay in receiving the stock caused economic injury to the plaintiff.

[5] These benefits included the following: full salary through December 31, 1985; medical benefits and the use of a car through December 31, 1985; and release of the plaintiff from all liability except for his obligations under certain previously executed noncompetition and nondisclosure agreements. The plaintiff received his final monetary compensation from the defendant on January 29, 1986, when he was paid deferred compensation and interest in the amount of $16,500. Because of the extension of his employment through December 31, 1985, the plaintiff was able to exercise options to purchase an additional 8334 shares of stock on October 10, 1985.

no dissatisfaction with his severance package,[6] he later maintained, through counsel, that his employability was being unfairly impaired because the defendant would not release him from the noncompetition clause that had been incorporated by reference into the severance agreement. Even then, he voiced no claim that the severance agreement was itself voidable on the ground of duress.[7] Instead, this letter reflected the fact that, during the months immediately after the plaintiff's termination, he had unsuccessfully sought professional employment as an electrical engineer. In the spring or early summer of 1986, however, soon after the expiration of his unemployment benefits, he stopped this line of inquiry and began devoting all his time to real estate investments. Not until January 20, 1987, did the plaintiff first assert a claim that the severance agreement was voidable because it had been obtained by duress.

This record categorically establishes that: (1) the only coercive conduct of which the plaintiff complains is the defendant's alleged threat to deprive the plaintiff of his right to exercise his stock options;[8] (2) this alleged

_____

[6] In two letters dated September 10, 1985, and October 15, 1985, the plaintiff wrote to the defendant's counsel with respect to certain Securities and Exchange Commission documents and to vacation pay; neither letter mentioned coercion or duress. Thereafter, on December 14, 1985, in a letter to the defendant's chairman, the plaintiff indicated his concern for finding alternate employment but also acknowledged that he did not "wish to hurt [the defendant's] company which has been good to me . . . ."

[7] The noncompetition clause in the termination agreement cannot serve as an engine of continuing coercive conduct by the defendant because that clause predated the plaintiff's termination. Thus, it had been a condition of the plaintiff's employment with the defendant long before any claimed coercion, and the plaintiff has never claimed otherwise.

[8] It is important to note what the plaintiff does *not* claim. He does not argue that his employment history with the defendant made it coercive for the defendant to terminate him under any and all circumstances. He does not contend that the severance agreement was inherently coercive because it incorporated by reference his prior agreement not to compete with the defendant by undertaking employment with specified competitors. He has

coercive conduct ended when the plaintiff exercised his options on August 6, 1985; and (3) the severance agreement conferred on the plaintiff measurable economic benefits that he has continued to retain. In light of this record, and the plaintiff's seventeen month delay in asserting his rights, the trial court determined that, although it had instructed the jury to determine whether the plaintiff's disaffirmance of the severance agreement was timely as a matter of fact, it was required to set aside the jury's verdict in the plaintiff's favor as a matter of law.

The scope of our review of a trial court's decision to set aside a jury verdict is limited to a determination of whether the trial court abused its discretion. "We have often held that '[t]he decision to set aside the verdict entails the exercise of a broad legal discretion that, in the absence of clear abuse, we shall not disturb. *O'Brien* v. *Seyer,* [183 Conn. 199, 208, 439 A.2d 292 (1981)].' *Palomba* v. *Gray,* 208 Conn. 21, 24, 543 A.2d 1331 (1988); *American National Fire Ins. Co.* v. *Schuss,* 221 Conn. 768, [774,] 607 A.2d 418 (1992); *State* v. *Hammond,* 221 Conn. 264, 270, 604 A.2d 793 (1992). In our review of the exercise of this discretion, we accord great weight to the trial court's decision; *Labatt* v. *Grunewald,* 182 Conn. 236, 240–41, 438 A.2d 85

not argued that he was coerced into signing the severance agreement by time pressure or that he, a college trained electrical engineer of sufficient means to exercise stock options, failed to understand the terms of the agreement or could not have sought the advice of counsel. Finally, he does not claim that any of the terms of the severance agreement were unconscionable or violative of good faith. The plaintiff's *only* claim of duress is his own subjective interpretation of the offer for the severance agreement as an implied threat of interference with his stock options.

Although the plaintiff testified that he had not consulted with counsel about the termination agreement, he also testified that, in 1979, he had enlisted the support of counsel in order to obtain company stock to which he was entitled by virtue of his employment agreement. No later than April 22, 1986, he again enlisted the support of counsel to challenge the validity of the noncompetition clause in his original employment contract.

(1980); so long as the trial court's exercise of its discretion does not infringe on the constitutional rights of the litigants to have issues of fact determined by a jury. *Seals* v. *Hickey,* 186 Conn. 337, 350, 441 A.2d 604 (1982). This right is an 'obviously immovable limitation on the legal discretion of the court to set aside a verdict . . . .' *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 (1970)." *Ginsberg* v. *Fusaro,* 225 Conn. 420, 425, 623 A.2d 1014 (1993); *Jackson* v. *R. G. Whipple, Inc.,* 225 Conn. 705, 722–29, 627 A.2d 374 (1993).

Although we have no case law that directly discusses whether a party may wait seventeen months to disaffirm, on the ground of duress, a severance agreement the benefits of which he has retained, the Restatement (Second) of Contracts (1981) contains the applicable principles. Section 381 (1) of the Restatement (Second) provides that "[t]he power of a party to avoid a contract for . . . duress . . . is lost if, after the circumstances that made it voidable have ceased to exist, he does not within a reasonable period of time manifest to the other party his intention to avoid it." As a general matter, comment (a) to § 381 provides that "what time is reasonable depends on all the circumstances, including the extent to which the delay was or was likely to be prejudicial to the other party . . . ." Comment (a) to § 381 adds, however, that "[o]rdinarily, if the party with the power of avoidance retains during the delay something that he has received from the other party, avoidance will be precluded by the rule stated in § 380." Section 380 (1) of the Restatement (Second), in turn, provides that "[t]he power of a party to avoid a contract for . . . duress . . . is lost if, after the circumstances that made the contract voidable have ceased to exist, he . . . acts with respect to anything that he has received in a manner inconsistent with disaffirmance." Read in its entirety, therefore, the Restatement equates the retention of benefits with

"delay [that is] prejudicial to the other party" and imposes strict time constraints on the avoidance for duress under such circumstances.

Application of the principles of the Restatement to the uncontroverted facts in this case lends strong support to the judgment of the trial court. The plaintiff nonetheless argues that the trial court abused its discretion in granting the defendant's motion to set aside the jury verdict. His argument is in two parts. As a general proposition, he relies on cases that have held that the affirmance or disaffirmance of a voidable contract depends on the intent of the person with the power to avoid. More specifically, he maintains that in the circumstances of his case, the jury could reasonably have found that he did not intend to ratify the termination agreement. We disagree.

The plaintiff maintains that the governing principle for analysis of his case is the general principle that ratification of a voidable contract is ordinarily a matter of intent. *Russell* v. *Dean Witter Reynolds, Inc.,* 200 Conn. 172, 186, 510 A.2d 972 (1986). As the plaintiff acknowledges, however, intent may be inferred from silence as well as from affirmative acts. *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.,* 171 Conn. 63, 72, 368 A.2d 76 (1976). The question necessarily becomes, therefore, whether the trial court abused its discretion in concluding that, as a matter of law, the plaintiff could no longer disaffirm the severance agreement in this case.

The plaintiff maintains that there was such an abuse of discretion because the plaintiff could not have been expected to decide whether to disaffirm the severance agreement while he was preoccupied with his need to find alternate employment as an engineer. That argument is unpersuasive for three reasons. First, it does not explain why the plaintiff did not raise his claim

when, in the spring or summer of 1986, he abandoned that search and undertook instead to become a real estate investor. Second, it focuses on the foreseeable difficulties that the plaintiff encountered as a result of the noncompetition clause, a clause that bears no relationship to the claim of duress that he is now pursuing. Third, it assumes that a contracting party can retain the benefits of a severance agreement for seventeen months and yet not ratify its terms, simply by turning his attention elsewhere. The plaintiff's job search did not deprive him of the opportunity to consider the validity of the severance agreement; indeed, his unsuccessful search for an engineering position at an acceptable salary furnished the occasion for retaining legal counsel and for correspondence with the defendant on this very subject.

The case law in other jurisdictions demonstrates that the dispositive question is not why the plaintiff chose not to disaffirm a contract that is voidable for duress, but whether, once the duress had ceased, he had the opportunity to do so. These cases hold, in accordance with the Restatement, that ratification results, as a matter of law, "if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or avoid it." *Gallon* v. *Lloyd-Thomas Co.*, 264 F.2d 821, 826 (8th Cir. 1959) (ten months too long); *Abbadessa* v. *Moore Business Forms, Inc.*, 987 F.2d 18, 23 (1st Cir. 1993) (five months too long); *DiMartino* v. *Hartford*, 636 F. Sup. 1241, 1252 (D. Conn. 1986) (two months too long); *Schmalz* v. *Hardy Salt Co.*, 739 S.W.2d 765, 767–68 (Mo. App. 1987) (three months too long); *Powell* v. *Oman Construction Co.*, 25 App. Div. 2d 566, 566, 267 N.Y.S.2d 862 (1966) (eleven months too long); *McGee* v. *Stone*, 522 A.2d 211, 214–15 (R.I. 1987) (eighteen months too long); see also 1 E. Farn-

sworth, Contracts (1990) § 4.19, p. 443. The only case of duress that the plaintiff cites to the contrary; *Furman* v. *Gulf Ins. Co. of Dallas,* 152 F.2d 891, 894–95 (8th Cir. 1946); is a case in which, contrary to the facts of this case, the disaffirming party had received no contractual benefits.

The defendant consistently maintained, in the trial court, that the plaintiff had ratified the severance agreement as a matter of law by accepting its benefits and by allowing seventeen months to pass before raising his claim of coercion. The trial court denied the defendant's motion for a directed verdict, presumably because it is sound judicial management to allow a case to go to the jury once it has been fully tried. The trial court, however, granted the motion to set aside the verdict for the plaintiff. We conclude that the trial court's decision was not an abuse of its discretion.

The judgment is affirmed.

In this opinion BORDEN and PALMER, Js., concurred.

NORCOTT, J., with whom KATZ, J. joins, dissenting. This case is not about current economic conditions or whether employers at large are at risk whenever they offer severance agreements to corporate employees. The dispositive issue in this appeal is whether, under the circumstances of this case, the jury could reasonably have found that the plaintiff had not ratified a voidable contract. The majority holds that as a matter of law the power of the party to avoid a contract on the basis of duress is lost when that party accepts the benefits of the contract for four months and delays a total of seventeen months before objecting to its validity. I disagree.

The issues of whether the plaintiff: (1) intended to ratify the agreement by accepting benefits thereunder; and (2) acted reasonably under the circumstances when

he allowed seventeen months to pass before expressly disaffirming the agreement are questions of fact for determination by the jury. Because there was sufficient evidence before the jury upon which it could have found that the plaintiff had not ratified the contract, I would reverse the judgment of the trial court and remand the case to that court with direction to render judgment in accordance with the jury verdict.

On the evidence presented at trial the jury reasonably could have found the following facts. This dispute arises out of the termination of the plaintiff's employment by the defendant, Data Switch Corporation (Data Switch). The plaintiff joined Data Switch in January, 1979, as an electrical engineer. The plaintiff was retained by way of a written agreement with the company's founder and president, Richard Greene.[1] He was hired to design and develop computer peripheral switches that connect computers with various pieces of external hardware such as printers and terminals. Due to the plaintiff's efforts and expertise, Data Switch began producing and shipping peripheral switches in October, 1979.

As a result of financial difficulties, Data Switch went through a restructuring from the fall of 1984 through the summer of 1985. In April, 1985, Robert Gilbertson became president and chief executive officer of Data Switch. Shortly thereafter, Gilbertson polled a number of employees in an attempt to ascertain which employees were significant to the success of the company. One outcome of the poll was that Gilbertson asked the plaintiff to take a paid leave of absence beginning on April 15, 1985. Subsequently, the plaintiff met with

[1] During the period of his employment, the plaintiff also entered into a noncompetition agreement and a nondisclosure agreement with Data Switch. The effect of the agreements was to prohibit the plaintiff from subsequently competing with Data Switch, while in his own or another's employ, by using any business related information that he had learned or developed while employed by Data Switch.

Gilbertson to discuss the plaintiff's future with the company during which it was decided that he would serve Data Switch in a consulting capacity. The plaintiff worked as a consultant through July 26, 1985. At that time, Gilbertson orally terminated the plaintiff's employment with Data Switch.

As of July 26, 1985, the plaintiff held vested rights in 40,000 shares of stock under the company's stock option plan (plan). Pursuant to the plan, a terminated employee could exercise vested stock options within ninety days after the date of termination, but not thereafter. On August 6, 1985, in order to protect his vested rights under the plan, the plaintiff sent to Gilbertson a letter and a check in the amount of $33,200.76, exercising his options. The option prices and the share prices were such that execution of the options on that date would have resulted in a net profit to the plaintiff of $167,000.

On August 10, 1985, the plaintiff received from Gilbertson a letter dated August 6, 1985. In the letter, Gilbertson noted the fact that the plaintiff had been on a leave of absence since April 15, 1985. By the letter, Gilbertson also offered the plaintiff a severance package. The offer consisted of $28,400 representing four months severance pay at the plaintiff's current annual salary of $85,200, $4916.40 representing three weeks of earned vacation time, and the continuation of both medical benefits and the use of a company car through October 15, 1985. The letter also offered to put the plaintiff on a leave of absence through October 15, 1985 so that he could exercise "a significant amount of company stock options." In exchange for the severance package, the letter sought a release from any claim that the plaintiff might have had against Data Switch, and an agreement not to work for specified competitors of the company.

The plaintiff perceived the letter as a threat to deprive him of his stock options and met with Gilbertson on August 14, 1985, in order to discuss the letter and the exercise of his stock options. At that meeting, the plaintiff voiced concern that he would not be able to exercise his stock rights if, as the letter intimated, his termination was made retroactive to April 15, 1985, the commencement of his leave of absence. Gilbertson reiterated his offer of a severance package in return for the execution by the plaintiff of a general release of all claims against Data Switch. As a result of this meeting, the plaintiff and Data Switch entered into a written termination agreement, which was drafted by Todd DeMatteo, Data Switch's corporate counsel, and signed by the parties the next day, August 15, 1985. The plaintiff did not consult with an attorney at any time during the negotiation or execution of the termination agreement.

Under the terms of the termination agreement, both parties agreed that the plaintiff's prior employment relationship with Data Switch was terminated as of April 15, 1985. Data Switch further agreed to: (1) pay to the plaintiff his then current salary for the period of July 1, 1985, through December 31, 1985; (2) provide the plaintiff with medical benefits and the use of a company car through December 31, 1985; (3) release the plaintiff from all liability except for obligations under certain previously executed noncompetition agreements;[2] and (4) retain the plaintiff as an employee from April 15, 1985, through December 31, 1985, during which period the demands made of the plaintiff would be limited so as not to interfere with other employment opportunities available to him. In turn, the plaintiff agreed to: (1) remain an employee of the company for the above stated term; and (2) release Data Switch from

---

[2] See footnote 1.

all liability except for obligations under certain previously executed stock option agreements.

On August 22, 1985, the plaintiff received the 40,000 shares of stock on which he previously had attempted to exercise his options and, on October 10, 1985, the plaintiff exercised options on 8334 additional shares of Data Switch stock. He also received the promised salary, the medical benefits and the use of the company car through December 31, 1985.

Subsequent to his termination, the plaintiff conducted an extensive, but fruitless, job search. He testified that he had pursued many leads in his field of expertise, but that any interested parties had been put off by the non-competition and nondisclosure agreements. He also had written a number of letters to Data Switch attempting to reach a friendly agreement regarding the non-competition and nondisclosure agreements.[3] After unsuccessfully seeking employment in his field, the plaintiff embarked on a new career in real estate during the summer of 1986. The plaintiff disaffirmed the termination agreement on January 22, 1987, and instituted the present action on December 30, 1987.

The jury returned a general verdict for the plaintiff. "[A] general verdict for [the plaintiff] raises a presumption that the jury found every issue in favor of the [the plaintiff]. *Alfano* v. *Insurance Center of Torrington,* 203 Conn. 607, 613, 525 A.2d 1338 (1987) . . . ." (Citations omitted; internal quotation marks omitted.) *Holbrook* v. *Casazza,* 204 Conn. 336, 345, 528 A.2d 774 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). The trial court set aside the verdict solely on the ground that the plaintiff had ratified the contract as a matter of law. No other issue has been

---

[3] These agreements, in existence during the plaintiff's employment, were thereafter incorporated by reference into the termination agreement of August 15, 1985.

challenged on appeal. I presume therefore that the plaintiff entered the agreement under duress. Thus, the sole issue before the court is whether the trial court properly concluded that the plaintiff had ratified the agreement as a matter of law.

The function of the trial court in setting aside a jury verdict and the role of this court in reviewing that action are well settled. It is within the broad legal discretion of the trial court to set aside a jury verdict that is not supported by the law or evidence. *Palomba* v. *Gray,* 208 Conn. 21, 24, 543 A.2d 1331 (1988). The court's exercise of its discretion is, however, limited by the litigant's constitutional right to have issues of fact determined by a jury. *Ginsberg* v. *Fusaro,* 225 Conn. 420, 425, 623 A.2d 1014 (1993). "The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that [the jurors] or some of them were influenced by prejudice, corruption or partiality." (Internal quotation marks omitted.) *American National Fire Ins. Co.* v. *Schuss,* 221 Conn. 768, 774, 607 A.2d 418 (1992). In reviewing the actions of the trial court, " 'we must examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion.' " Id., 775. Applying these principles to the facts of this case, I conclude that the trial court abused its discretion by setting aside the jury verdict because there was sufficient evidence in the record to support it.

I agree with the majority opinion that the Restatement (Second) of Contracts contains the relevant principles. I agree that one who wishes to avoid a contract entered into under duress must express the intention

to avoid it "within a *reasonable* time"; (emphasis added) 3 Restatement (Second), Contracts § 381 (1981); and that "what time is *reasonable depends on all the circumstances,* including the extent to which the delay was or was likely to be prejudicial to the other party . . . ." (Emphasis added.) Id., comment (a), p. 237. I also agree that pursuant to § 380 of the Restatement (Second) of Contracts, one who has been coerced into a contract as a result of duress may lose the power to disaffirm it "if, after the circumstances that made the contract voidable have ceased to exist, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance."

I disagree, however, with the majority's assertion that the Restatement (Second) of Contracts must be read only to equate the retention of benefits "with 'delay [that is] prejudicial to the other party.' " In my view, § 380 must be read in light of the comments to that section to express the rule that conduct consistent with affirmance results in ratification when it manifests a willingness to affirm the contract. If such conduct otherwise can be explained, it does not necessarily manifest a willingness to affirm the contract. Accordingly, ratification of the contract cannot be presumed as a matter of law.

Comment (a) to § 380 provides that "[a] party who has the power of avoidance may lose it by action that manifests a willingness to go on with the contract." Comment (b) to § 380 provides that such willingness may be expressed by "the exercise of dominion over what he has received in a manner inconsistent with avoidance of the contract." Thus, read in conjunction with comments (a) and (b), § 380 allows conduct to evidence affirmance, when such conduct also demonstrates that the party so acting was willing to go on with the contract. If, however, a party can show that

the acceptance or retention of the benefits was the product of something other than a willingness or intention to comply with the contract, then that conduct will not necessarily be presumed to constitute affirmance of the contract as a matter of law. Under those circumstances, affirmance could not be determined solely on the basis of the retention of benefits.

This reading comports with the common understanding that intention is "[a]n essential element in the doctrine of ratification . . . ." *Gallon* v. *Lloyd-Thomas Co.,* 264 F.2d 821, 826 (8th Cir. 1959). It is axiomatic that one cannot ratify a contract unintentionally. Indeed, we have held, with respect to a contract entered into by an agent without authority, that ratification requires "acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances." (Internal quotation marks omitted.) *Russell* v. *Dean Witter Reynolds, Inc.,* 200 Conn. 172, 185, 510 A.2d 972 (1986); *Botticello* v. *Stefanovicz,* 177 Conn. 22, 28, 411 A.2d 16 (1979). Although intent may be inferred from unexplained silence; *Hartford Accident & Indemnity Co.* v. *South Windsor Bank & Trust Co.,* 171 Conn. 63, 72, 368 A.2d 76 (1976); it need not conclusively be presumed. The question therefore becomes whether the jury reasonably could have found that the plaintiff did not acquiesce in the agreement.

The plaintiff presented evidence at trial from which the jury reasonably could have found that he retained benefits under the termination agreement and did not disaffirm it until January 22, 1987, for reasons other than to ratify or confirm it. The plaintiff testified that his overriding concern during the period subsequent to the signing of the agreement was to find gainful employment. The evidence before the jury included a letter written by the plaintiff to the president of Data Switch in December, 1985, which stated that the

acceptance of an employment contract with a competitor was "necessary in order to feed my family and educate my children." In addition, the plaintiff testified that in the course of his employment he had entered into noncompetition and nondisclosure agreements with Data Switch that hampered and thus lengthened his job search. The jury reasonably could have found from this evidence that the plaintiff delayed in disaffirming the contract out of necessity; that is, that he waited until after he had secured new employment before devoting his time, money and energies toward initiating litigation that might not have been resolved for years to come.[4]

Data Switch counters that two letters sent to the company constituted irrefutable evidence that the plaintiff had acquiesced in the agreement. Specifically, Data Switch argues that the letters do not disaffirm the termination agreement and contain language to the effect that the plaintiff was treated well with respect to the employment relationship. Both letters, however, were requests to the company to release the plaintiff from the noncompetition and nondisclosure agreements in order to facilitate his job search. The jury reasonably could have understood the friendly language in those letters as puffery aimed at initiating negotiations regarding the agreements that stood in the way of his employment search. Moreover, such a finding is consistent with the plaintiff's claim that he was more concerned with feeding his family and paying his bills than with confronting his former employer.

---

[4] I am hesitant to support a rule that prompts one to resort immediately to litigation, without the flexibility to first attempt to work things out. Such a rule is particularly harsh in light of the fact that our law also requires that one who challenges a breach of contract must also mitigate damages. *Danpar Associates* v. *Somersville Mills Sales Room, Inc.,* 182 Conn. 444, 446, 438 A.2d 708 (1980). Here, the plaintiff diligently sought to remedy the situation by engaging in an extensive job search and should not be penalized therefore.

On the basis of the foregoing, I am persuaded that there was adequate evidence presented at trial from which the jury reasonably could have found that the period of time between the execution of the stock options and repudiation of the agreement was reasonable and that the retention of benefits for the same period was not evidence of a willingness to comply with the contract. I conclude therefore that the trial court abused its discretion by setting aside the jury verdict that was supported by the evidence.

Moreover, I am not persuaded by the cases from other jurisdictions holding that accepting benefits and not disaffirming for certain periods of time results in ratification as a matter of law. See, e.g., *Gallon* v. *Lloyd-Thomas Co.*, supra, 264 F.2d 826; *Abbadessa* v. *Moore Business Forms, Inc.*, 987 F.2d 18, 23 (1st Cir. 1993); *DiMartino* v. *Hartford*, 636 F. Sup. 1241, 1252 (D. Conn. 1986); *Schmalz* v. *Hardy Salt Co.*, 739 S.W.2d 765, 767–68 (Mo. App. 1987); *Powell* v. *Oman Construction Co.*, 25 App. Div. 2d 566, 566, 267 N.Y.S.2d 862 (1966); *McGee* v. *Stone*, 522 A.2d 211, 214–15 (R.I. 1987). Notwithstanding their application of the principles of the Restatement (Second) of Contracts regarding ratification, these cases are dissimilar to the case at hand and ultimately do not bear on the factual claims raised by the plaintiff in this appeal. Each involved a challenge to the plaintiff's claim of duress. In the majority of these cases, the court concluded that there had been no duress. Only thereafter did each of the courts proceed to conclude that the contract in issue had been ratified as a matter of law when the plaintiffs accepted the benefits thereunder before taking action to disaffirm. Additionally, the court in each of these cases failed to discuss any evidence in the record, similar to the evidence in this case, that would justify the delay or the receipt of benefits. Because those cases involved unexplained acceptance of benefits and delay, they are inapplicable to the present case.

Finally, insofar as the Restatement (Second) of Contracts principles are directed at avoiding double recovery by the party claiming duress or prejudice to the party claiming ratification, neither danger is presented in this case. First, Data Switch has not argued that it was in any way prejudiced by the delay.[5] Second, as the jury was properly instructed, any benefits received by the plaintiff under the termination agreement were to be set off against his claim for damages under the employment contract. See *Furman* v. *Gulf Ins. Co. of Dallas,* 152 F.2d 891, 895 (8th Cir. 1946). The doctrine of duress exists to protect a party from the obligations of a contract that the party entered into involuntarily as a result of improperly coercive conduct by the other party to the contract. 1 E. Farnsworth, Contracts (1990) § 4.9, pp. 400–402. The object of the rules on duress is to return the parties to their respective positions prior to the agreement. Id., 401. A strict rule requiring that a party claiming duress must return any benefits received under the agreement prior to instituting an action for duress unnecessarily dilutes the effectiveness of this remedy when as noted above the parties can be protected through setoff.[6]

Accordingly, I respectfully dissent.

[5] In fact, Data Switch argues in its brief to this court that considerations of prejudice or reliance are irrelevant to the question of whether the plaintiff ratified the contract.

[6] Analogously, we have held in the workers' compensation area that an employee's tort claim is not barred by the receipt and retention of benefits under the workers' compensation system. *Suarez* v. *Dickmont Plastics Corp.,* 229 Conn. 99, 115–17, 639 A.2d 507 (1994). In that area, we have stated that a strict election system requiring an injured worker to choose between collecting under the workers' compensation system or under tort law would transform what is a security system for injured workers "into a grandiose sort of double-or-nothing gamble. Such gambles are appealing to those who still think of the judicial process as a glorious game in which formal moves and choices are made at peril, and in which the ultimate result is spectacular victory for one side and utter defeat for the other." Id., 117, quoting 2A A. Larson, Workmen's Compensation (1993) § 67.31, p. 12-158.