Francis J. GORMAN,

v.

EARMARK, INC. and Gerald Bloom.

No. 3:96cv190 (JBA).

United States District Court, D. Connecticut.

June 16, 1997.

Gregg D. Adler, Livingston, Adler, Pulda & Meiklejohn, Hartford, CT, for Francis J. Gorman.

Steven David Ecker, Cowdery & Ecker, Hartford, CT, for Earmark, Inc., Gerald Bloom.

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 23]

ARTERTON, District Judge.

## I. FACTS

Plaintiff Francis Gorman was employed by the Defendant as a vice-president from November, 1986, until his termination by the Defendant Gerald Bloom on October 12, 1994. The Bloom and Gorman families had been friends, and when Bloom purchased Earmark in 1986, he asked Gorman to join him as the second-in-command. Gorman has a college degree in history, and over the course of his business experience he has taken classes in financial management and personnel relations. His previous employment experience included training and firing employees. At Earmark, he handled all manufacturing operations, which according to Bloom included accounts payable, quality control, and personnel.

The company apparently did well, although sales had slipped since 1991. Gorman joined the Board of Directors in 1987, and became a shareholder in 1988 when Bloom sold him five percent of the company's shares for $25,000. In addition, over the course of his employment at Earmark Gorman received seven promissory notes apparently evidencing Earmark's indebtedness to him, totaling approximately $43,500.

Gorman became ill in the summer of 1994, and was hospitalized for surgery in August. He recovered at home during the month of September, and then returned to work on a part-time basis. By the beginning of October, Gorman was working on a full-time basis, but with a reduced schedule of hours. On October 12, 1994, Bloom called Gorman into his office, and fired him. The conversation only lasted a few minutes, but Bloom mentioned that he would "buy him out." The following morning, the two met again, and

Bloom told Gorman that his salary would be paid until the end of the month, and that he would receive unused vacation pay. Gorman's insurance coverage would be terminated at the end of the month, and he would also have to return his company car. Bloom then offered Gorman $60,000 for both his stock holdings and the outstanding promissory notes. Gorman told Bloom that he believed the stock was worth more, and asked if he could keep the company car until after his daughter's wedding. The next day, Gorman asked to have his medical coverage extended; Bloom agreed, and told him he could keep the car as he had requested. Bloom also indicated that after discussing it with his wife, he had decided to raise the amount Earmark was willing to pay for the stocks and the notes to $70,000. Bloom then gave Gorman a letter of resignation, which Gorman signed.

Gorman deliberated over the weekend, and then phoned Bloom to tell him he would accept the $70,000 payment for his Earmark stock and promissory notes on Monday, October 17. Bloom told Gorman to contact Earmark's lawyer to handle the transaction, as Bloom was leaving town. After some trouble locating the notes, Gorman and his daughter met with Attorney Brandon Hickey at his office on Friday, November 4, 1994. Gorman testified that when they entered the room they saw a large stack of papers with the check on top. After signing all the documents relating to the stock and note transaction, Hickey gave Gorman a document entitled "Release" and asked him to sign it. Gorman testified that he did not expect this document, and that there had been no prior discussion of any waiver of legal claims. Hickey told Gorman that if he refused to sign the release, the "deal was off," and that if Gorman wished, one of Hickey's partners who specialized in employment issues would review the release with him. Gorman refused, signed the release, and then left the office with the check for $70,000 which he promptly deposited.

Plaintiff thereafter brought suit alleging violations of the Age Discrimination in Employment Act (ADEA), the Americans with

Disabilities Act (ADA), the Connecticut Fair Employment Practices Act (FEPA), the Employee Retirement Income Security Act (ERISA), and two state tort claims against defendant Bloom. Presently before the Court is Defendants' motion for partial summary judgment, asserting that the release bars all counts except plaintiff's ADEA claim.[1]

## II. DISCUSSION

### 1. Standard

Pursuant to Federal Rule of Civil Procedure 56, Earmark is only entitled to summary judgment if there is no genuine issue as to any material fact, and the defendant is entitled to judgment as a matter of law. "In ruling on a motion for summary judgment, a court must resolve all ambiguities and inferences from the underlying facts in favor of the non-moving party." *Levin v. Analysis & Technology, Inc.*, 960 F.2d 314, 316 (2d Cir. 1992). "If there is any evidence in the record from which a reasonable inference (can) be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995). Similarly, "if the party opposing summary judgment generates uncertainty as to the true state of the material facts, the procedural weapon of summary judgment is inappropriate." *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 (2d Cir.1989) (citations omitted).

### 2. Federal–Law Claims

■ The Second Circuit has directed the Court to consider a set of factors in determining the enforceability of a waiver of an employee's rights under federal law. These factors are 1) the employee's education and business experience; 2) the amount of time the employee has possession of or access to the agreement before signing it; 3) the role of plaintiff in deciding the terms of the agreement; 4) the clarity of the agreement; 5) whether the plaintiff was represented by or consulted with an attorney; 6) whether the consideration given in exchange for the waiver exceeds the employee benefits to which the employee was already entitled by contract or law; and 7) whether the employer encouraged or discouraged the employee to consult an attorney. *Bormann v. AT & T*, 875 F.2d 399, 403 (2d Cir.1989). The standard is a "totality of the circumstances" approach, not a checklist, and therefore courts cannot insist on rigid adherence to such a list. Rather, the essential question is a pragmatic one: whether in the circumstances, the waiver was knowing and voluntary. *Laniok v. Advisory Committee of the Brainerd Manufacturing Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir.1991).

■ Considering the *Bormann* factors, a reasonable jury could conclude that the facts here do not present sufficient indicia that Gorman waived his federally protected ADA and ERISA rights knowingly and voluntarily. While plaintiff certainly is an experienced businessperson with a college degree, this history does not necessarily dictate that any waiver is consequently knowing and voluntary. *See George v. Mobil*, 739 F.Supp. 1577 (S.D.N.Y.1990) (disputed facts remained as to whether sophisticated international businessman knowingly signed release).

As to the second factor, it is undisputed that the plaintiff had not seen the agreement prior to his meeting in Hickey's office. While defendants allege that Gorman had *access* to the release, in that Bloom purportedly told Gorman a release would be required two weeks prior to the signing of the documents, a dispute of fact exists as to whether plaintiff reasonably should have known that a release of claims was part of the bargain struck prior to his November 4 meeting with Earmark's counsel. If plaintiff's version is believed, he first encountered the possibility of the release in Hickey's office, after signing a series of other papers, and had at most ten minutes to consider the document. Gorman Dep. II at 194. Gorman and Hickey also disagree as to whether Gorman was told that he could consult an attorney outside of Hickey's firm, or that he could delay the closing in order to further consider

---

1. The defendants concede that the release at issue does not conform to the statutory requirements of 29 U.S.C. § 626(f), which governs waivers of employee rights under the ADEA.

the release. Gorman Aff. para. 14; Hickey Dep. at 37–38.

A reasonable jury could decide that under the circumstances, the time given Gorman to consider the release was not sufficient to knowingly and voluntarily relinquish important rights. *See Laniok v. Advisory Committee,* 935 F.2d 1360 (2d Cir.1991) (jury could find that issue of waiver of pension benefits never raised until employee was presented with typed document, thus summary judgment for employer not justified); *Cf. Evans v. Waldorf–Astoria Corp.,* 827 F.Supp. 911 (E.D.N.Y.1993) (amount of time sufficient where employee only had access to agreement for a few hours, but agreement was the result of negotiations in which employee was represented by attorney). Thus application of the second factor raises a disputed issue of fact.

The defendants next argue that the plaintiff here was "substantially involved in the back-and-forth negotiations of the severance package," and that it is inappropriate to treat the release terms as unilaterally imposed because the plaintiff failed to review the release prior to the closing when given the opportunity to do so. As discussed above, the parties dispute whether Mr. Gorman knew or should have known about the release before he came to Hickey's office on November 4. A reasonable jury could conclude that even if the agreement regarding Gorman's medical plan, company car, and stock holdings was "bargained," any "bargain" reached by the parties covered only the disposition of his stock and notes, not a release of his ADA and ERISA claims. Again, taking all inferences in favor of the plaintiff, a jury could find that Gorman had only a minimal role in deciding the terms of the agreement, and the third factor weighs against summary judgment for Earmark and Bloom.

The plaintiff does not dispute that the terms of the agreement were clear and unambiguous, the fourth factor in the *Bormann* analysis. *See* Defendant, Ex. A. Similarly, the parties do not dispute that Gorman did not consult a lawyer prior to signing the agreement, though they do disagree as to whether Gorman was encouraged to consult outside counsel regarding the release. Hickey Dep. at 14–15. The primary controversy focused on by the parties concerns the sixth *Bormann* factor: whether the consideration given in exchange for the waiver exceeds remuneration to which the employee was already entitled by contract or law. It is this factor that most persuasively highlights for the Court why summary judgment is inappropriate at this juncture. Uncertainty exists as to the true state of the material facts regarding whether Gorman received additional consideration in exchange for the release.

Defendant contends that as an at-will employee, Gorman was entitled to absolutely nothing at his termination, and therefore he received adequate consideration for the release by: 1) payment of his salary until the end of the month; 2) payment of his health insurance through the next month; and 3) payment for his stock in Earmark and for promissory notes that were not yet due. Plaintiff disputes that the $70,000 paid to Gorman even compensated him for the actual value of the stock and the notes, and that based on this evaluation, a jury could conclude that Gorman received nothing additional for signing the release.[2]

Plaintiff claims that on October 17, 1994, the date of Gorman's final discussion with Bloom, Gorman was legally entitled to the severance package they had agreed upon and the payment of the $70,000 for the stocks and notes. Therefore, after reaching agreement on other terms, the defendants were required to offer additional consideration in order to support the release. "A release is not supported by sufficient consideration unless something of value is received to which [the employee] had no previous undisputed right." *DiMartino v. City of Hartford,* 636

---

2. Plaintiff argues that the $70,000 represents only $1,396 over Gorman's initial stock purchase of $25,000 and the $43,604 face value of the notes. Based on evidence such as the company's increasing gross profit percentage, the rise in Special Officer's Compensation, and the fact that Gorman's stock generated cash payments to him each year in excess of the amount offered by Bloom in a one-time transaction, plaintiff contends that a reasonable jury could conclude that the $70,000 payment was substantially less than the value of the stock.

F.Supp. 1241 (D.Conn.1986) (upholding release of ADEA claims). Though Gorman has not fully articulated the argument, he implies that he was entitled to the agreed-upon severance package, even without the release, perhaps under an implied contract or promissory estoppel theory. A jury could conclude, based on the evidence presented, that the $70,000 and the additional severance benefits were compensation for the stocks and notes, and that based on the Gorman's and Bloom's discussions, the plaintiff was entitled to them even without the waiver. "It is an accepted principle of law in this state that when a party agrees to perform an obligation for another to whom that obligation is already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract...." *Brian Construction & Development Co. v. Brighenti,* 176 Conn. 162, 166, 405 A.2d 72 (1978). Gorman has presented sufficient facts to allow a jury to find that he was entitled to the $70,000 and the remaining severance benefits in exchange for tendering the stocks and promissory notes, and that therefore the release was not supported by other valid consideration.

Further, plaintiff argues that no one from Earmark mentioned a release until two weeks after he concluded his severance package agreement with Bloom, thus putting in factual dispute the nature of consideration as bargained for.[3] On this record, the Court concludes that there are sufficient disputed facts to support a finding that the requirement of a release was not disclosed prior to the meeting in Hickey's office and thus a jury could conclude that the package of benefits did not include consideration for the release of claims, particularly where, by the time of the signing of the release on November 4, 1994, Gorman had already received the benefit of most of the severance package: he had used the car for the additional week, and he had received his paycheck through the end of October. It is axiomatic that past consideration cannot support the imposition of a new obligation. *Dick v. Dick,* 167 Conn. 210, 224, 355 A.2d 110 (1974).

The facts here are distinguishable from other employment cases involving a waiver, where the agreement recites the amount of consideration, and the parties do not dispute that a certain dollar amount was exchanged in consideration for the agreement. *See Rice v. United Technologies Corp.,* 1996 U.S.Dist. Lexis 16911 * 11 (employee did not dispute that he accepted and retained three thousand dollars in consideration for signing the waiver); *Bormann,* 875 F.2d at 401 (Termination Payment plan included two options, the more lucrative of which was clearly contingent on a release of all claims); *Baba v. Warren Management,* 882 F.Supp. 339, 343 (S.D.N.Y. 1995) (pursuant to negotiated settlement, plaintiff received no increase in award for release, but did benefit from employer's failure to appeal award); *Nicholas v. NYNEX,* 929 F.Supp. 727 (S.D.N.Y.1996) (plaintiff received $15,125 in addition to his separation pay, and acknowledged that he was not entitled to sum if he did not sign the release).

The factual scenario of this case is most analogous to *George v. Mobil Oil Corporation,* 739 F.Supp. 1577 (S.D.N.Y.1990). In that case, a high level executive signed a release upon termination, and received a substantial severance package. However, the court concluded that it was by no means clear that the consideration given in exchange for the waiver exceeded benefits to which the employee was already entitled. *George,* 739 F.Supp. at 1581. The written benefits plan for terminated employees made no reference to a release, and the memorandum confirming the agreement between the employee and employer did not mention the release as a precondition of the termination allowance. *Id.* The District Court held that "[t]hese omissions, together with the other remaining questions, raise a genuine issue of material fact about the voluntariness of the release sufficient to defeat summary judgment." *Id.* at 1582. Similarly, the factual disputes in the present case regarding whether Gorman received anything of value beyond that which he was owed, combined

---

**3.** The Restatement (Second) of Contracts puts it this way, in § 71: "(1) To constitute consideration, a performance or a return promise must be bargained for. (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and it is given by the promisee in exchange for that promise."

with the controversy over whether he was told that a release would be required, preclude summary judgment for Earmark.

The Court is aware that many courts examining the issue of the enforceability of releases of discrimination claims have found in favor of the employer. *See, e.g., Rice v. United Technologies,* 1996 U.S.Dist. Lexis 16911 (D.Conn.); *Nicholas v. NYNEX,* 929 F.Supp. 727 (S.D.N.Y.1996); *Dewey v. PTT Telecom Netherlands,* 1995 WL 542447 (S.D.N.Y.). Courts recognizing the enforceability of such releases have articulated the policy considerations underlying such decisions. *See Fortino v. Quasar Co.,* 950 F.2d 389, 394 (7th Cir.1991) (enforcing waiver despite employee's belief at the time of signing that it was unenforceable, because "otherwise no release, no accords and satisfactions, no contracts, period, would be enforceable against a party who became dissatisfied with the deal he had struck."). *But see Pierce v. Atchison Topeka and Santa Fe Ry. Co.,* 110 F.3d 431, 437–38 (7th Cir.1997). While recognizing the usefulness of waivers in settlements by which both employee and employer obtain the certainty of finality, the Court also recognizes that courts must not lightly infer waivers of federal remedial rights. *See Bormann,* 875 F.2d at 403. Despite plaintiff's position as a high-placed executive and part owner of the company, if his description of his termination and the subsequent discussions regarding his stock and notes is believed by the jury, they could reasonably conclude that the release was an eleventh-hour addition to the agreement, extracted from Gorman without negotiation and additional consideration, and thus not enforceable. The Court thus concludes that summary judgment is an inappropriate vehicle for weighing the totality of the circumstances here.

### 3. *State–Law Claims*

Defendants also challenge plaintiff's state statutory claim against Earmark under the Connecticut Fair Employment Practices Act and his three common-law claims against Bloom, on the grounds that these counts are also barred by the release. The appropriate criteria in determining the validity of the release are somewhat less clear as to the state-law claims than as to the federal-law claims. Defendants contend that Connecticut only recognizes traditional contract defenses to a release of claims, rather than looking to the *Bormann* totality of the circumstances test. Plaintiff disagrees with this analysis, but also maintains that summary judgment is inappropriate even under traditional principles of contract law.

In considering the appropriate standard to apply, the Court concludes that plaintiff's state statutory claim should be distinguished from the common-law claims. First, as to the statutory claim, Connecticut courts have not addressed the issue of what standard or analytical approach should be applied to waivers releasing claims under state anti-discrimination law. However, as plaintiff correctly notes, the Connecticut Supreme Court is often guided by federal precedent in the employment discrimination context. *Levy v. Commission on Human Rights and Opportunities,* 236 Conn. 96, 102, 671 A.2d 349 (1996) ("Although the case is based solely on Connecticut law, we review federal precedent for guidance in enforcing our own anti-discrimination laws"); *cf. Miko v. Commission on Human Rights and Opportunities,* 220 Conn. 192, 202–203, 596 A.2d 396 (1991) (in interpreting state fair housing statute, court will be guided by federal law and cases interpreting the federal fair housing laws). "Nevertheless, [the Connecticut courts] have also recognized that, under certain circumstances, federal law defines the beginning and not the end of our approach to the subject." *State v. Commission on Human Rights and Opportunities,* 211 Conn. 464, 469–70, 559 A.2d 1120 (1989).

In arguing that Connecticut law only looks to ordinary contract principles in determining the enforceability of a release, defendants rely on *Young v. Data Switch Corp.,* 231 Conn. 95, 646 A.2d 852 (1994), in which the Connecticut Supreme Court upheld a release of claims signed as part of a severance agreement. In so doing, the court considered and rejected the employee's defense of duress. There is no indication, however, that the employee argued that the release was not knowing and voluntary under a *Bormann*

totality of the circumstances analysis. More importantly, however, the suit in *Young* was brought under state common law, and thus provides little guidance as to how the Connecticut Supreme Court would view a release in the context of an action brought under a state employment discrimination statute.

In the absence of authority to the contrary, and given the use by Connecticut courts of federal precedent as guidance in the area of discrimination law, the Court concludes that the *Bormann* "totality of the circumstances" approach is the appropriate analysis for evaluating plaintiff's claims under the Fair Employment Practices Act. In originally adopting the *Bormann* test, the Second Circuit emphasized its consistency with "the strong congressional purpose ... to eradicate discrimination in employment." 875 F.2d at 403. Defendants have offered no reason to believe that Connecticut courts interpreting and implementing the legislative intent in the Fair Employment Practices Act would reach any different result. In light of this conclusion, as well as the analysis of the *Bormann* factors set forth above, the Court concludes that summary judgment is inappropriate as to plaintiff's state statutory claim.

A somewhat different analysis would seem to obtain with respect to the plaintiff's common-law claims. The particular concerns for furthering a legislative intent to eradicate employment discrimination, which motivated the adoption of the *Bormann* test, are not present in this context. Nonetheless, plaintiff contends that a totality of the circumstances test should also be applied.

In support of his position, plaintiff notes that the Connecticut Supreme Court, in *Young*, indicated that factors such as time pressure, availability of counsel, and education might be relevant to the enforceability of a release. *See* 231 Conn. at 100 n. 8, 646 A.2d 852. However, the court did not suggest that these factors would be of significance outside the context of a common-law claim of duress. Plaintiff also relies on *Delgado v. Martinez*, 25 Conn.App. 155, 159, 593 A.2d 518 (1991), in which the court held that a waiver "can only be effective if one voluntarily relinquishes a known right." However,

as the Second Circuit suggested in *Bormann*, this holding simply begs the question of whether voluntariness is measured by reference to "ordinary contract principles" or to the totality of the circumstances. *See* 875 F.2d at 403 (noting that other circuits "apply 'ordinary contract principles' in determining whether a waiver has been signed 'knowingly and willfully,'" but nonetheless adopting "more stringent" totality of the circumstances test). In short, the Court concludes that plaintiff's reliance on *Young* and *Delgado* is misplaced.

Although the Court concludes that the validity of the release as to the common-law claims is governed by "ordinary contract principles," defendants are not necessarily entitled to summary judgment. In particular, plaintiff argues that the release is invalid for lack of consideration. Defendant responds that Connecticut law makes it clear that adequacy of consideration is generally not an issue for the court or jury, as long as there is evidence of some consideration. *Ross v. Koenig*, 129 Conn. 403, 406, 28 A.2d 875 (1942) (if settlement made and free from fraud or duress, adequacy of consideration was for the plaintiff to decide, not jury). However, as the Court concluded *supra*, there are genuine factual disputes as to whether *any* consideration was provided in exchange for the promise not to sue. Past consideration, or no consideration at all, cannot support the imposition of a new obligation. *Van Dyck Printing Company v. DiNicola*, 43 Conn.Supp. 191, 195, 648 A.2d 898 (1993) (citing *Dick v. Dick*, 167 Conn. 210, 355 A.2d 110 (1974)). In light of the uncertainty as to whether fresh consideration was provided in connection with the release, the Court concludes that summary judgment is inappropriate as to the common-law claims, as well as to the statutory claims.

III. Conclusion

For the foregoing reasons, Defendants' Partial Motion for Summary Judgment [doc. # 23] is DENIED.

IT IS SO ORDERED.