## SAMUEL H. DICK *v.* JACK R. DICK

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued June 11—decision released August 27, 1974

*Charles G. Albom* and *Richard A. Bieder,* with whom, on the brief, was *Theodore I. Koskoff,* for the appellant (plaintiff).

*Bourke G. Spellacy,* with whom were *James H. Lloyd III* and, on the brief, *Stuart N. Updike,* for the appellee (defendant).

MacDonald, J.   The plaintiff, Samuel H. Dick, brought this action against his son, the defendant, Jack R. Dick, seeking to enforce an agreement (hereinafter referred to as the agreement) entered into between them on August 6, 1960.   The plaintiff sought as relief an order directing the defendant to account for his financial gains during the period extending from August 6, 1960, to the time of the action; an order directing the defendant specifically to perform his part of the contract; damages of $20,000,000; an order declaring the defendant to be a constructive trustee for the plaintiff; an order directing the defendant to convey to the plaintiff one-half of his financial gains for a period subsequent to the action; and costs and such other relief as might be equitable or lawful.   The defendant counterclaimed.   The court ordered a bifurcated trial in which the issue as to the authenticity of the

defendant's signature to the agreement was tried to a jury, the jury finding the issue in favor of the plaintiff. The court ruled that since the remaining issues to be litigated were equitable in nature, the court would hear them without a jury. The court found the issues for the defendant on the complaint and for the plaintiff on the counterclaim, and the plaintiff has appealed from the judgment so rendered.

The plaintiff has assigned as error the refusal of the trial court to find the facts set forth in more than 300 paragraphs of the draft finding, the inclusion in the finding of forty paragraphs alleged either to be contrary to the evidence or in language of doubtful meaning and of sixteen conclusions claimed to be unsupported by subordinate facts and the law, and the overruling of fifty-nine claims of law. He also assigned error in several procedural and evidential rulings of the court, in its failure to draw certain conclusions from the subordinate facts, in the rendition of judgment for the defendant when the conclusions reached by the court do not support that judgment, and in the denial of the plaintiff's "motion to open judgment."

The term "wholesale," as applied to the plaintiff's attack on the finding, seems grossly inadequate. By whatever term it is denominated, however, it is precisely that type of attack which this court has frequently criticized and, apparently to no avail, attempted to discourage. Such attacks tend to cloud the real issue and in themselves cast doubt on the party's claims. *State* v. *Miselis,* 164 Conn. 110, 114, 318 A.2d 102; *Branford Sewer Authority* v. *Williams,* 159 Conn. 421, 424, 270 A.2d 546. This is particularly true where, as here, there is conflicting

testimony as to many of the corrections sought. *Catania* v. *Conforte*, 130 Conn. 178, 181, 32 A.2d 646. Despite the obfuscation necessarily incident to such a method of presenting an appeal, it is apparent that this appeal presents two central issues: (1) whether the trial court erred in taking the case from the jury; and (2) whether there was consideration for the contract.

The finding, which is subject to only minor correction,[1] reveals the following relevant facts: The trial

[1] The sheer scope of the plaintiff's challenges to the finding precludes any detailed discussion of them. The only additions worthy of note are those paragraphs relating to the court's rulings as to what issues were to be submitted to the jury for their consideration. Certain minor corrections were made to the finding of facts; e.g., one finding should be corrected to indicate that the plaintiff received "regular" or "weekly" rather than "daily" reports. However, none of these minor corrections is in any way determinative of the issues on this appeal.

In respect to the plaintiff's requested additions to the finding, many of them constitute "claims of proof" relating to the evidence heard by the jury in the first hearing. Since the trial court expressly ruled that consideration had to be proved before the court by evidence and that the court would not consider testimony from the jury hearing on that issue, a ruling to which the plaintiff did not take exception, and since the plaintiff did not in any way object to the jury's finding on the issues before it, these paragraphs have no bearing on this appeal. The remaining requested additions either are implicit in the finding, immaterial, not admitted or undisputed, or are merely cumulative details which would not directly affect the ultimate facts upon which the judgment depends; therefore no additions are warranted. *Southern New England Contracting Co.* v. *State*, 165 Conn. 644, 646 n.1, 345 A.2d 550; *Salvatore* v. *Milicki*, 163 Conn. 275, 303 A.2d 734.

The plaintiff's claims that facts were found without evidence or in language of doubtful meaning constitute, in effect, a request that this court retry the facts and determine the credibility of the witnesses. We have repeatedly stated that credibility of witnesses is the province of the trial court and that we will not usurp that function. *LaReau* v. *Warden*, 161 Conn. 303, 305, 288 A.2d 54; *Banks* v. *Adelman*, 144 Conn. 176, 179, 128 A.2d 534, and cases cited. In this case, where the finding and the appendices are replete with indications that both parties participated in extensive fraudulent practices, this rule must apply with particular force.

court ordered a bifurcated trial in which the issues as to the authenticity of the defendant's signature to the agreement were tried to the jury. The jury found, through interrogatories, that the defendant had in fact signed the document in question in his New York city apartment on August 6, 1960. The agreement is set out in full in the footnote.[2]

The plaintiff, the father of the defendant, was, at the time of trial, seventy-two years old and the defendant, at that time, was forty-three.[3] The plain-

---

[2] "JACK R. DICK
1 West 81st Street
New York 24, N. Y.

August 6, 1960

I, Jack R. Dick, by this letter to my father, Samuel H. Dick, do here and now acknowledge my indebtedness to my father in that I was made a partner in his business without any investment on my part which I have shared equally with him and that monies and jewelry in the amount of $70,000.00 Seventy thousand dollars was put up by my father and mother to make partial restitution for some of the many problems I was confronted with.

Through my gross neglect and improper acts, I was solely responsible for the loss of the business.

Because of my love and affection for my father, and fully realizing my responsibility and indebtedness to him, I here and now give him an equal share in any financial gains I will obtain.

The above being based on a moral obligation I owe my father for not paying him what is legally his, said Seventy Thousand dollars ($70,000.00.)

Payments to my father shall be made from time to time upon his request.

This agreement is effective from the above date for a period of 15 years, terminating on the 5th day of august 1975.

I have read the above and do hereby set my hand and seal this sixth day of August 1960.

Signed:
Jack R. Dick

In the presents of:
Samuel H. Dick
Edward I. Dick"

[3] The defendant, Jack R. Dick, died on January 6, 1974. His wife was qualified as executrix on January 30, 1974, and has been substituted as party defendant in this action. However, the term "defendant" as used herein will refer to the deceased, Jack R. Dick.

tiff's wife, Betty Dick, is the defendant's mother. The plaintiff and one Richard Gardner were engaged in business in New Jersey from 1948 to 1959. In 1948, the defendant left Syracuse University to work in the plaintiff's enterprises as a clerk. These enterprises were operated by and emanated from the Modern Block Company and were involved in the manufacture of a variety of articles, including stoves, kitchen cabinets, vanities, sliding doors, sink tops, and wardrobe closets. Some of these enterpises were corporations, others partnerships. The defendant, without putting up any funds, received a one-third interest in every one of the companies which the plaintiff owned, and retained that interest until the termination of the activities of the companies, although he actually received no stock or partnership papers. By 1957, the various enterprises operated by the plaintiff employed from 300 to 400 people. Prior to the defendant's association with the plaintiff, the plaintiff and Gardner were the sole owners of these companies. The plaintiff retired to Florida, but opened a warehouse and worked much of his time there, telephoning frequently to the New Jersey companies to give orders to his partners and employees. All checks to be drawn on all of these enterprises had to be signed by the plaintiff and Gardner, and were mailed to the plaintiff in Florida for his signature. While in Florida the plaintiff learned of one check that Jack Dick had signed without authority.

The plaintiff was engaged in the practice of fictitious billing in 1948, before the defendant joined his businesses. Through this practice the plaintiff borrowed money from banks and other lending institutions at a time when the defendant was merely a clerk in the plaintiff's businesses. The plaintiff

engaged in false billings for a number of years thereafter and used two supervising employees to further this practice. Two disinterested witnesses who participated in the plaintiff's financial schemes described in detail the modi operandi of the plaintiff. The practice of false billing continued through all the years that the plaintiff and the defendant were with the companies and resulted in a borrowing of over one million dollars on non-existent inventory as collateral for loans.

The plaintiff and Gardner maintained two sets of records, a correct set and one to record the false pre-billing records. Pre-billing is a practice that helps to obtain money on actual orders before they are filled by borrowing against goods sold before shipment. About seventy to eighty percent is realized on loans on such bills that are factorized. While the plaintiff was in Florida he continued to control his many businesses by constant and long telephone calls and by insisting that all checks and documents be mailed to him. The relationship between the plaintiff and the defendant was very unfriendly.

Cosmo Cassenese, supervisor of loading, traffic manager and supervisor of records for the plaintiff's businesses, admitted signing false bills of lading for non-existent inventory and obeyed all orders of the plaintiff. Cassenese was involved in false billing at the plaintiff's request between 1956 and 1959, the years immediately prior to the bankruptcy of the companies. The plaintiff and Gardner asked Cassenese to furnish the names of carriers to insert in bills of lading even though these carriers were never contacted or used, thereby falsifying the records. The plaintiff and Gardner also ordered

Cassenese to make out many false records so that it appeared that products were being held in their warehouse. After signing many false bills of lading Cassenese refused to sign any further documents. A salesman, attempting to find goods he had sold, failed to locate the non-existent merchandise. When a salesman was about to inquire from Cassenese about goods, Cassenese was told by the plaintiff to "get lost." Cassenese testified that the goods listed on many bills of lading were not shipped because they were not in existence. After Cassenese refused to become further implicated in the scheme of false billings, a secretary named Agnes Norton made out the false bills of lading, describing cabinets and ovens.

An employee of the plaintiff's companies, one Bernard DeCoufle, who worked eleven years prior to 1959 for the plaintiff manufacturing sliding doors, testified that in 1956 the plaintiff ordered him to build a false pile of plywood which had the appearance of being a solid mass but which actually consisted of a hollow cavern veneered by a very small amount of plywood. DeCoufle did in fact build the false pile of plywood so as to create the impression of an enormous pile which was used by the plaintiff as inventory against which moneys were borrowed. DeCoufle received orders from the plaintiff all the time DeCoufle was with the company, regardless of whether the plaintiff was in Florida or New Jersey.

The false bills of lading involved borrowing of more than a million dollars from at least two lending institutions and the plaintiff's companies, when they could not repay their loans to these lending companies, were declared bankrupt. The plaintiff was in complete charge of the financial end of the

business up to the date of bankruptcy and the defendant, who was in charge of sales, was not allowed to handle any financial dealings. The plaintiff and Gardner were constantly in touch with the finance companies and the defendant was excluded from these dealings. The plaintiff and Gardner were paying exceptionally high interest rates for moneys borrowed and the borrowing kept increasing until finance notes were being renewed daily with no payments actually being made on the principal. The plaintiff and Gardner were the only ones who could sign finance notes. The plaintiff returned to New Jersey when his enterprises, with debts amounting to over one million dollars, were insolvent and he was fully aware of this condition, having been informed regularly.

Meanwhile, the defendant was not inactive. He was engaged in financial and stock transactions, including one involving the Carpenter Steel Company in which he failed to reimburse buyers in a number of guarantee agreements he had made. The plaintiff's wife and Mrs. Maultz, her sister, put up $55,000 to assist him in his difficulties. The plaintiff did not furnish any money to help the defendant.[4] More specifically, he did not furnish any money for the defendant to make restitution with regard to any financial obligation of the defendant concerning

---

[4] The plaintiff challenged this finding but it is amply supported by the evidence printed in the defendant's appendix and is therefore retained. The plaintiff also has pointed out another paragraph of the finding which, it is claimed, is inconsistent with the finding that the plaintiff did not furnish any money to help the defendant. In order to clarify the finding we have examined the trial court's memorandum of decision. *Kriedel* v. *Krampitz*, 137 Conn. 532, 535, 79 A.2d 181; *Van Tassel* v. *Spring Perch Co.*, 113 Conn. 636, 647, 155 A. 832; Maltbie, Conn. App. Proc. § 152. The memorandum leaves no doubt that the court found, and intended to find, that the plaintiff did not furnish any financial support to assist the defendant.

Carpenter Steel, nor did he pay any gambling debts of the defendant. The defendant's mother, and not the plaintiff, put up security, consisting of jewels worth between $32,000 and $35,000, and turned over the moneys obtained thereby to a law firm to straighten out the problems with the participants in Carpenter Steel. The defendant did not agree to reimburse the plaintiff or the plaintiff's wife for any losses incurred by reason of the plaintiff's or his wife's purchases of Carpenter Steel stock.

The defendant admitted fraud upon the plaintiff's companies through one Stolow Company's billheads. He took checks payable to Stolow Company to an actual company named Stolow, a legitimate stamp dealer, with which he purchased stamps in large quantities. The amounts on each check were very large, from $10,000 to $20,000 on each check. The defendant admitted his modus operandi with regard to Stolow to the plaintiff, and the plaintiff and the defendant then divided the proceeds of the money obtained from their companies.

The plaintiff's companies became insolvent, and ultimately bankrupt, through fraudulent financial schemes in which both the defendant and the plaintiff were involved. The plaintiff in May, June or July, 1960, accused the defendant of ruining the plaintiff's business and of taking every dime the plaintiff had, and took the position that the only way he could recoup his losses was to sue the defendant. The plaintiff told the defendant that he wanted to get a judgment in the event that the defendant became able to make restitution to the plaintiff. The defendant at that time was involved in financial transactions and did not want to be embarrassed by a lawsuit brought by his father. The defendant then

said to the plaintiff: "Dad, what do you want to sue me for? I'll give you an agreement." In consequence, the plaintiff did not sue the defendant, instead entering into an agreement with him.

Thereafter, in 1962, the defendant went into the cattle business, naming the company he formed "Black Watch Farms." Over a period of years after the defendant entered the cattle business, the plaintiff asked for an accounting almost every month, but the defendant never gave him one.

The preceding statement of facts may appear unduly lengthy but it is considered necessary background for the equitable as well as the legal issues which we are called upon to determine.

We consider first the claim of the plaintiff that the court erred in not submitting the entire cause of action to the jury for their consideration.[5] The court withdrew from the jury the issues to be decided, other than the authenticity of the agreement itself, because they were "equitable and complicated."

It is well settled that "where the essential right asserted is equitable in its nature and damages are sought in lieu of equitable relief or as supplemental to it in order to make that relief complete, the whole action is one in equity and there is no right to a jury trial." *Berry* v. *Hartford National Bank & Trust*

---

[5] The defendant argues that by failing to object when the trial court made the specific ruling that the issues remaining after the jury hearing would be heard by the court, the plaintiff waived his right to a jury trial. While there is some merit to this claim, because of the peculiar circumstances existing at the time of the ruling, the complexity of this litigation, the fact that the defendant did except to rulings which arguably raised the issue, and the view we take of this claim, we will consider it.

*Co.,* 125 Conn. 615, 619, 7 A.2d 847; *Clipfel* v. *Kantrowitz,* 143 Conn. 184, 189, 120 A.2d 416; *Savings Bank of New London* v. *Santaniello,* 130 Conn. 206, 210, 33 A.2d 126. Where, however, the essential right asserted is primarily legal, the fact that relief in equity in aid of or supplemental to it is demanded will not destroy the right of either party to have the issues of law submitted to the jury. *Berry* v. *Hartford National Bank & Trust Co.,* supra, 618. The determination dispositive of this issue is, therefore, whether the plaintiff asserted an essentially equitable or an essentially legal cause of action. We find that it was unquestionably equitable.

The plaintiff's complaint was in four counts. The first count sought an accounting by the defendant coupled with specific performance of the agreement and damages of twenty million dollars. The second count sought an order declaring that the defendant be declared a constructive trustee for the use and benefit of the plaintiff, specific performance of the agreement until the date of judgment and damages of twenty million dollars. In addition to the relief sought in the second count, the third count sought specific performance from the date of the judgment until August 5, 1975. The final count sought a conveyance of certain properties to a trust or, in the alternative, the setting aside of a prior transfer of the properties as null and void and damages of twenty million dollars.

It is apparent from the mere recitation of the relief sought that specific performance of the contract was the primary relief sought, with an accounting coupled with a constructive trust to facilitate that performance. It is hardly necessary to point out that specific performance is an equitable

remedy; see *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 25, 166 A.2d 710; 4 Pomeroy, Equity Jurisprudence (5th Ed.) § 1400 et seq.; or that a constructive trust is likewise equitable in nature. See *Harper* v. *Adametz*, 142 Conn. 218, 113 A.2d 136; 1 Pomeroy, op. cit., § 155. Although an accounting is also a legal remedy, it "has become to a great extent equitable"; 1 Pomeroy, op. cit. § 112; see *Roberts* v. *Weiner*, 137 Conn. 668, 673, 81 A.2d 115; particularly where it is used as a preliminary step in establishing other rights, as is the case here. 1 Pomeroy, op. cit. § 112. That the action is essentially equitable is further illustrated by the fact that the plaintiff sought relief extending into 1975. Such future performance could be enforced only through a decree directing that the defendant specifically perform the contract until its expiration date.

The plaintiff, of course, also claimed damages for breach of the contract. However, he did not seek them in the alternative or as a separate count, and the mere claim of damages does not make the action essentially one at law. See *Dzubin* v. *Dzubin*, 121 Conn. 646, 186 A. 652; *Malkan* v. *Hemming*, 82 Conn. 293, 73 A. 752. The claim of damages herein appears to be, at best, in lieu of or ancillary to the claims for equitable relief. The court did not err in withdrawing the equitable issues in the case from the jury.

The plaintiff also maintains that the court committed error in "not assigning during bench trial . . . certain important legal consequences flowing from the doings of the jury . . ." in "that it failed to give adjudicatory effect to the doings of the jury on the bench trial following, proper and necessary

to be attributed to such doings during bench trial."
While the precise nature of this claim is unclear, it
seems to be based on the court's rulings that the evi-
dence offered at the trial before the jury could not
be considered on the issues to be tried to the court.
In any event, we find no merit to the claim. The
court, although properly concluding that the action
was primarily equitable, acted within its discretion
in submitting certain factual questions to the jury.
General Statutes § 52-218; *Dzubin* v. *Dzubin,* supra.
The jury were limited in their consideration to the
factual issue of the genuineness of the defendant's
signature to the contract. Obviously the court did
give legal effect to the jury's responses to the inter-
rogatories regarding that issue. Since, as we have
noted, the court properly reserved the remaining
issues to itself, we see no reason why it was bound
to attach other consequences to the jury's determina-
tion.

We turn next to the primary issue presented by
this appeal, namely, the question of whether there
was consideration for the agreement. The plaintiff
appears to make two arguments in support of his
claim that there was valid consideration: (1) that
that which was recited within the agreement itself
constituted consideration; and (2) that the plain-
tiff's forbearance from suing the defendant in
exchange for the promise contained in the agree-
ment was sufficient. We note that, since the contract
was entered into in New York and there is no show-
ing that the parties thought of it as anything but a
New York transaction, the validity and construction
of the contract are governed by the law of New
York. *Breen* v. *Aetna Casualty & Surety Co.,* 153
Conn. 633, 639, 220 A.2d 254. We must also point
out, however, that we will not enforce "the law of

another jurisdiction, or the rights arising thereunder, which we conceive to be 'injurious to our public rights' or to the 'interests of our citizens,' nor those which 'offend our morals,' 'contravene our [public] policy' or violate our positive laws." *Reilly* v. *Pepe Co.,* 108 Conn. 436, 445, 143 A. 568.

Insofar as the stated consideration of $70,000 is concerned, it is obvious that, if the contract were to be governed by Connecticut law, it would not be valid in that the consideration is "past consideration" which will not support a promise. *Osborne* v. *Locke Steel Chain Co.,* 153 Conn. 527, 533, 218 A.2d 526. New York, however, has abrogated that rule by statute; N. Y. Gen. Obligations Law § 5-1105 (McKinney 1964); which is set out in full in the footnote.[6] The statute requires that the stated consideration be "proved to have been given." The trial court concluded that the plaintiff did not sustain his burden of proof that the $70,000 stated consideration was actually paid or supplied by him, a conclusion which is amply supported by the finding of the court that the plaintiff did not furnish any money to help the defendant. Therefore the stated consideration cannot suffice as actual consideration for the contract.

The plaintiff, however, vigorously argues that his forbearance from suit was sufficient consideration for the agreement. In support of this proposition

[6] "[N. Y. Gen. Obligations Law § 5-1105 (McKinney 1964)] **Written promise expressing past consideration** A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed."

he points to the findings indicating that in response to his threat to sue the defendant for ruining his business, the defendant said: "Dad, what do you want to sue me for? I'll give you an agreement," and that consequently the plaintiff did not sue the defendant, instead entering into the contract with him.

Forbearance from suit is, of course, valid consideration for a contract if the claim on which the suit was threatened was valid and enforceable. *Hyde* v. *Lipiec,* 12 Misc. 2d 107, 173 N.Y.S.2d 901; 1 Corbin, Contracts § 139; 1 Williston, Contracts (3d Ed.) § 135; 17 C.J.S., Contracts, § 104 (1). Moreover, "[i]t is a general rule of law that forbearance to prosecute a cause of action, where the right is honestly asserted under the belief that it is substantial, although it may in fact be wholly unfounded, is a valuable consideration which will support a promise." *Joffe* v. *Bonn,* 14 F.2d 50, 52 (3d Cir.). See *Warner* v. *Warner,* 124 Conn. 625, 632, 1 A.2d 911. Forbearance, however, is not a sufficient consideration unless the claimant had some reasonable ground for belief in the justice of the claim; 1 Corbin, op. cit. § 140; *Warner* v. *Warner,* supra; or if the claim is not made in good faith. *Pash* v. *Wagner,* 2 Misc. 2d 822, 151 N.Y.S.2d 411; *Plunkett* v. *O'Connor,* 162 Misc. 839, 295 N.Y.S. 492; 17 C.J.S., Contracts, § 104(2).

The court found that both the plaintiff and the defendant were engaged in widespread fraudulent practices which resulted in the financial failure of the companies in which they were involved. The absence of any reasonable ground for a belief in the validity of a claim which has been forborne generally justifies a conclusion that such forbearance

does not constitute valid consideration. 1 Corbin, op. cit. § 140. The trial court did in fact conclude that there was no consideration for the contract, indicating in its memorandum of decision that the plaintiff had not sustained his burden of proof " 'that a valid consideration was given.' " This conclusion is amply supported by the finding previously referred to that the plaintiff himself was involved in the fraudulent financial schemes which ultimately destroyed his businesses, for such destruction was the basis of his threatened action against the defendant and thus also the basis of his claimed forbearance.

Even if there was doubt as to the validity of the claimed forbearance, as consideration, it could not be resolved in favor of the plaintiff. If a claim is founded on a transaction known to be illegal, there are added reasons for holding that forbearance is not a sufficient consideration. 1 Corbin, op. cit. § 140; *Smilansky* v. *Mandel Bros.*, 254 Mich. 575, 236 N.W. 866. Here the transaction upon which the forbearance was founded—the failure of the plaintiff's businesses—resulted from an appalling sequence of fraud and financial manipulation actively and knowingly participated in by both parties. While it is not necessary to do so in the instant case, this court has ruled contracts unenforceable solely on the grounds of such illegality. In *Warshow* v. *Elwood & Son,* 83 Conn. 430, 76 A. 531, this court held that the trial court properly dismissed an action on its own motion, stating (p. 435) : "The contract and the whole enterprise, from its inception to the close of it, is stamped with fraud, corruption, and bad faith toward the public by all the parties, plaintiff and defendants; and not only that, but there was bad faith and deceit on the part of this plaintiff

toward his equally corrupt associates, and we cannot forbear to express our astonishment that any litigant should so far presume upon the patience of this court as to present and urge an appeal of this character."

While the descriptive passages of the opinion of this court in *Warshow,* supra, eloquently portray the type of circumstances surrounding the case before us, we need not base our decision on the illegal roots of the contract except insofar as this leads us to resolve any possible doubt about the validity of the forbearance as consideration in favor of the view that it is insufficient. Consequently the contract is unenforceable in that it lacks any valid consideration.

The plaintiff also assigns error in the denial by the trial court of his "motion to open the judgment." The motion apparently was predicated on "newly-discovered evidence," allegedly to be found in a book entitled "From Rogues to Riches," in which the defendant is a principal subject, the book having been published after the trial court rendered judgment. The plaintiff claims that evidence culled from the book would have been admissible to impeach the credibility of the defendant. " 'Newly-discovered evidence which is merely cumulative, or which impeaches the . . . credibility of a witness, will not suffice ordinarily to grant a new trial, and never unless it appears reasonably certain that injustice has been done in the judgment rendered, and that the result of a new trial will probably be different.' *Apter* v. *Jordan,* 94 Conn. 139, 143, 108 Atl. 548; *Crook* v. *Clarke,* 124 Conn. 317, 319, 199 Atl. 428." *Comcowich* v. *Zaparyniuk,* 131 Conn. 40, 41–42, 37 A.2d 612. There was already ample evidence of the

defendant's unsavory financial dealings before the court and there certainly has been no showing tending to indicate that further evidence of that kind would have altered the decision. Accordingly, error cannot be predicated on the court's denial of the motion.

Some of the remaining assignments of error were not briefed and are considered abandoned. *State* v. *Bitting*, 162 Conn. 1, 3, 291 A.2d 240. The view we have taken of the issues discussed is dispositive of the case, and it is therefore unnecessary to discuss any further subordinate claims.

There is no error.

In this opinion the other judges concurred.