**Patrick J. BRYAN, Plaintiff,**

v.

**WILLIAM M. MERCER, INC., Defendant.**

**No. 98CV1492 (JBA).**

United States District Court, D. Connecticut.

June 7, 1999.

is before the Court on plaintiff's motion for partial summary judgment as to Count Three, seeking a declaratory judgment that a Non–Solicitation Agreement ("NSA") is unenforceable, or in the alternative, for money damages.

### Legal Standards

A party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). When a court is confronted with facts that permit several different conclusions, all inferences from the underlying facts must be drawn in the nonmovant's favor. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). The trial court must bear in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the non-movant, which must "demonstrate more than 'some metaphysical doubt as to the material facts, ... [and] must come forward with specific facts showing that there is a genuine issue for trial.'" *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (citations and emphasis omitted). Summary judgment is granted only when "there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), or, in other words, only if "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994). The trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is

Edward V. O'Hanlan, Cummings & Lockwood, Stamford, CT, for Patrick J. Bryan, plaintiffs.

James C. Riley, Whitman, Breed, Abbott & Morgan, Greenwich, CT, for William M. Mercer, Inc, defendants.

### Ruling on Plaintiff's Motion for Partial Summary Judgment as to Count Three [doc. # 13]

ARTERTON, District Judge.

In this diversity action removed from state court, the plaintiff Patrick J. Bryan sues his former employer, William M. Mercer, Inc. ("Mercer"), for breach of contract, violation of the Connecticut Wage Statute, and a declaratory judgment. The matter

confined at this point to issue-finding; it does not extend to issue-resolution." *Id.*

### Factual Background

In 1997, plaintiff's employer A. Foster Higgins, Inc. ("Foster Higgins"), merged with the defendant corporation Mercer. Prior to that time, plaintiff Bryan had been employed by Foster Higgins as a managing consultant. As part of his compensation arrangement with Foster Higgins, Bryan received an annual salary and had the opportunity to participate in Foster Higgins' incentive compensation program, which provided significant bonus opportunities based on "a combination of firmwide and individual performance against quantitative and qualitative goals achieved." (Pl.'s Ex. A). Foster Higgins did not require its employees to complete any type of non-competition agreement as a prerequisite to participation in this incentive compensation plan.

After the merger with Mercer, the plaintiff was informed by his supervisor Chris Mooney on July 1, 1997, that Bryan was eligible to participate in the Mercer Incentive Compensation Performance award program, and could earn a bonus of "0–45% of base compensation depending on performance." (Pl.'s Ex. F).

In December of 1997, Bryan's supervisors confronted him regarding reports of plaintiff's abusive behavior towards other employees. (Pl.'s Ex. L). Bryan was warned that further such behavior, which he denied, could be grounds for termination.

On December 18, 1997, Bryan received a memorandum regarding the Incentive Compensation Plan from Marcia Inch, the Office Head for Mercer's Stamford, Connecticut office. In this memorandum, Inch explained that:

> As a participant in the William M. Mercer Companies, Inc. Incentive Compensation Plan, you will be eligible annually for an incentive award. This award will recognize your individual performance against specific goals and success measures as well as your contributions to the success of your team and the overall performance of the Company.

> The operation of the Plan is governed by the Plan document, a copy of which is enclosed with this letter. One of the conditions of participation in the Plan requires all entrants to sign a Non–Solicitation Agreement. You should sign the enclosed copy and return it to Holly Pike within the next few days.

(Pl.'s Ex. K). In a March 16, 1998 memorandum, Inch indicated that Bryan's 1997 bonus would be $27,000 "conditioned upon his execution of the Non–Solicitation Agreement." (Pl.'s Ex. Q). On March 18, 1998, Bryan signed the NSA, and returned it to Inch with a note reading: "Attached is the executed agreement. I assume you'll take the appropriate steps in getting the 97 ICP check cut. Thanks." (Pl.'s Ex. R). Apparently still unsatisfied with Bryan's behavior, Mercer terminated Bryan's employment effective May 22, 1998.

### Discussion

Bryan contends that the NSA was unsupported by any adequate consideration, and thus unenforceable, because he had already earned his 1997 bonus while subject to the Foster Higgins bonus plan, which did not include a NSA requirement, before the Mercer plan went into effect. *See Dick v. Dick,* 167 Conn. 210, 355 A.2d 110 (1974) (past consideration cannot support imposition of new obligation); *Van Dyck Printing Co. v. DiNicola,* 43 Conn. Supp. 191, 196, 648 A.2d 898 (1993) (covenant not to compete must be supported by adequate consideration). In support of this contention, Bryan asserts that it is undisputed that once the merger took place, the plaintiff continued under the terms of the Foster Higgins bonus plan, and the performance parameters contained therein, and that although Mercer had the opportunity to modify the terms of that

plan, it chose not to do so. (*See* Pl.'s Mem. in Support at 8 (citing Pl.'s Ex. F)).

According to the plaintiff, as early as November 1997, he had met the quantitative bonus goals set for him under the Foster Higgins plan (as explained in a memorandum from Mooney, Pl.'s Ex. E), thus his rights to a bonus for 1997 "vested" at that time, before the Mercer plan with its NSA requirement became operative. (*See* Pl.'s Mem. in Support at 8 (citing Pl.'s Ex. G and H)). Bryan further asserts that it is undisputed that he was not presented with a copy of the Mercer Incentive Compensation Plan and the NSA until December 18, 1997, and it was only at that time that execution of the NSA as a condition of the receipt of the 1997 bonus became effective.

Bryan does not contest that Mercer had discretion to adjust the *amount* of the bonus, but rather maintains that as of November 1997, the plaintiff had earned the right to a bonus by fulfilling certain objective criteria set forth. (*See* Pl.'s Mem. in Support at 9 (citing Pl.'s Ex. G, H, P, and Q)).

Plaintiff's argument must fail, however, for failure to establish initially that there is no dispute of fact as to the what bonus plan was in effect from the time of the merger to the end of 1997.

In Marcia Inch's affidavit submitted in opposition to the summary judgment motion, she maintains that:

> Mercer adopted and implemented an Incentive Compensation Plan a number of years ago through which employees above a certain level became eligible for bonus consideration (the "Plan"). A true and correct copy of the Plan *in effect during 1997* is appended hereto as Exhibit A.
>
> Section 6 of the Plan expressly states that as a condition of participation therein, the Mercer employee is required to execute a non-solicitation agreement.

(Aff. of Inch, ¶¶ 4–5) (emphasis added). If the Mercer plan came into effect upon completion of the merger, Bryan's argument that he earned the 1997 bonus under the terms of the Foster Higgins bonus plan, which did not require a non-compete agreement as a condition of participation, must fail.

The plaintiff claims that Plaintiff's Exhibit F, a July 1, 1997 memorandum from Chris Mooney to Bryan, establishes that Bryan remained bonus-eligible, that the Foster Higgins bonus-plan standards continued to be in effect, and that the Mooney memorandum implies no changes to those standards. In fact, what Mooney indicates in this memorandum is that a change has taken place:

> The firm has completed its initial review of compensation amounts, grade levels, and bonus targets which will be used for the evaluation period from 4/1–12/31/97. The base compensation will remain in effect till the next raise cycle date, 3/98. Your grade will be a 16. This carries a bonus, or Incentive Compensation Performance award, range of 0–45% of base compensation depending on performance. As at Foster Higgins, the higher end of that range will require significant and above average contributions to the firm, accompanied by good overall firm performance. Your base salary will be unchanged from current level. We will be working with you to set appropriate goals for the remainder of the year.

(Pl.'s Ex. F). Contrary to Bryan's suggestion that this memorandum implies no changes, it is a reasonable inference that the overall thrust of this memorandum is to inform Bryan that former Foster Higgins employees will be subject to new compensation arrangements under Mercer, and that there have been changes, particularly to the Incentive Compensation Program. The explicit comparison to the bonus regime at Foster Higgins implies that while the current plan retains some features in common with the previous program, it is in fact a new plan that is different from the Foster Higgins plan. Such differences include, among others, a

45% cap on bonuses rather than the previous 50% cap, and a new system under which Bryan is a "grade 16." (*cf.* Pl.'s Ex. A).

That a new governing bonus plan came into effect at the beginning of April 1997 is supported by a December 1997 e-mail exchange among Bryan, his supervisor Vincent Rubino, and Judith Kass, the Manager of Human Resources. In this correspondence, Bryan asks for clarification as to whether "participation for 1997 is on a pro rata basis." (Pl.'s Ex. O). Rubino responds that "My understanding is that the ICP award for former [Foster Higgins] folks is to be based on your base pay cash flow from 3/1 through 12/31." (*Id.*). Kass corrects this information and relates that "The 9 month cash flow takes in the period 4/1 through 12/31." (*Id.*). As with the Mooney memorandum, it is a reasonable inference is that April 1, 1997 marks a change-over from the Foster Higgins compensation plan to something new under Mercer, and that Bryan had some understanding that the merger engendered changes.

In further support of drawing such an inference from these documents is the fact that Bryan, and other former Foster Higgins employees, received a bonus from Foster Higgins for the first three months of 1997, after close out of the Foster Higgins books, further marking April 1, 1997 as a changing point in terms of the compensations arrangements. (Dep. of Bryan at 83, Def.'s Ex. A).

While Bryan concentrates on establishing that his qualitative performance met the expectations outlined in pre-merger memoranda, he simply does not establish that there is no genuine dispute of fact as to which plan was in effect post-merger. It is reasonably inferable from the record that the Mercer plan was in effect from April 1, 1997, thus creating a genuine dispute of material fact as to whether Bryan earned a right to a bonus prior to the imposition of the NSA requirement.

## Conclusion

Accordingly and for the foregoing reasons, plaintiff's motion for partial summary judgment [doc. # 13] is DENIED.

**IT IS SO ORDERED.**