[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case arises out of an employment contract containing a non compete/confidentiality agreement purportedly executed on December 9, 1997 between the plaintiff and the individual defendant Sarah Nickelson. The plaintiff's complaint in three counts claims a breach of that contract and a violation of the Connecticut Unfair Trade Practices Act CT Page 11153 against Nickelson individually. The second defendant Premier Staffing Services is the company that Sarah Nickelson has worked for since she left the employ of the plaintiff on November 23, 1998. In its claim against Premier, the plaintiff claims a violation of the Connecticut Unfair Trade Practices Act (CUTPA).
The plaintiff is in the business of providing staffing services on a full and part time basis to its clients which it represents to be in Fairfield and New Haven Counties in Connecticut and Putnam and Westchester Counties in New York. In essence, the plaintiff provides to its clients people to perform specific outline functions that its clients need. Premier is in the same business. Premier has offices in Danbury, Shelton and Stamford in Connecticut and White Plains, Yorktown Heights and Manhattan in New York as well as Rutherford, New Jersey. Fairfaxx has as its only office Norwalk, Connecticut. Each company has a pool of candidates for employment and a Group of clients and the job of each company is to determine the skill set of each candidate so that they can match them up to specific client needs. Candidates are generally procured through newspaper advertising, referrals from existing candidates, job and vocational fairs, community agencies and schools. As would not be unexpected, each company's data base contained some similar names of candidates. Clients are generally recruited by sales people, appointments and networking events. In general terms, the generation of clients and candidates is hardly rocket scientry or work requiring any high level of technology skills.
Sarah Nickelson was first employed by Fairfaxx in January of 1997 as a temporary employee working as a receptionist at a company called Aviator in Stratford, Connecticut until March of 1997 when she became a temporary employee at Fairfaxx, also as a receptionist until May of 1997. This was her first job since leaving college. In May of 1997 she was hired by Fairfaxx on a permanent basis as a personnel consultant, was trained and eventually began interviewing candidates and placed candidates in jobs with clients. She had no employment contract and was nothing more than an employee at will.
Ms. Nickelson remained in that capacity uneventfully until December of 1997 when at a lunch meeting with company officials she and the rest of the plaintiff's employees were presented with a document known as a "Confidentiality and Non Compete Agreement." Although Ms. Nickelson and Mr. Joseph Tucci, on behalf of the plaintiff, differ on the niceties of that meeting, it was made perfectly clear by management that if the employees did not sign, they had no job the next day. Ms. Nickelson was troubled by the agreement, called her father but eventually signed the agreement containing six pages on December 9, 1997, which agreement was offered as plaintiff's exhibit 1. CT Page 11154
The agreement was clearly, by its language, Intended to be a bilateral contract. On page two it referred to the "mutual promises" of the parties and on page six there was a signature blank for both the plaintiff and the individual defendant. The problem was that Ms. Nickelson signed for both parties and no one signed for the plaintiff and apparently no one picked it up when Ms. Nickelson turned it in. When the court questioned Mr. Tucci, he admitted that it was clearly contemplated that someone on behalf of the plaintiff should have signed the agreement (transcript July 31, 2000, p. 61), but he was not sure if they in fact signed any of them.
What is absolutely clear is that when Ms. Nickelson signed the agreement she got absolutely nothing fob it. Her job stayed the same, benefits the same and the job description the same. This is important because the plaintiff's complaint is replete with claims that she, on or about December 9, 1997, was "promoted" to a higher position for which there is no evidence.
In December, 1997, Ms. Nickelson was making $23,000 plus commissions, almost all of which was derived for one client, Warnaco.
The court will deal with the specific terms of the agreement shortly, but now back to Ms. Nickelson. Some time in January of 1998, Ms. Nickelson was promoted to Manager of the Temporary Division at Fairfaxx, but that had nothing to do with the agreement of December 9, 1997, nor was there any evidence that it was even contemplated at that time. Her duties remained the same, that she performed as a personnel consultant. She lived in Fairfield, Connecticut during this time, but in November of 1998, she moved to Patterson, New York, approximately 20 minutes west and north of Danbury. At or about that time, she received a call from a recruiter offering her a job interview at Premier.
Ms. Nickelson met with Stella Burnberg, the sales person in Premier's Danbury office, as well as Premier's President, Paul Schwabe. She mentioned the non compete agreement and subsequently sent Mr. Schwabe a copy of it. There were two subsequent interviews. She eventually took a job at Premier on November 23, 1998 because the commute was so much shorter and the commissions higher.
At the time Ms. Nickelson left Fairfaxx, she admitted to drawing candidates from Fairfield County only. She spoke to Schwabe about the employment agreement and, after he reviewed it, he indicated it would not be a problem. When she first went to work for Premier at their Danbury office, Ms. Nickelson did interview candidates and she placed candidates for a short time. She was, however, hired at Premier as staffing CT Page 11155 coordinator or staffing manager. In January of 2000 she began working on site for Reader's Digest in Pleasantville, New York handling the temps there. She no longer interviews, screens, tests or refers candidates to Premier clients. Candidates for jobs at Reader's Digest are filled from candidates supplied through the Yorktown Heights office of Premier. During her time at Premier, Ms. Nickelson admitted that she assisted Sheila Roman at Premier's Shelton office in placing one employee at Warnaco, which was both a client of the plaintiff as well as a client of Premier, although she had no idea what kind of commission was paid, if any. There is nothing she presently does that remotely competes with the plaintiff.
The plaintiff next called Gloria Marrero Favreau, who is employed as branch manager of Premieres Danbury office. She was subpoenaed to bring with her any document pertaining to or identifying any and all clients of Premier to which Sarah Nickelson had referred any candidate, which client conducts business in Westchester or Putnam Counties in New York and New Haven and Fairfield Counties in Connecticut. She is the person who would have such documents. Ms. Favreau testified that if Ms. Nickelson did in fact refer any clients it would be recorded in the activity report and there were none. The record further reflected that Ms. Nickelson recruited no candidates. Plaintiff's exhibit 3, Premier's activity report, disclosed at most that the defendant Nickelson only met with one client and one candidate.
The plaintiff then called Joseph Tucci, the Vice President of the plaintiff. He described the basic structure of the plaintiff and how it conducts its business. He indicated his company competes with Premier and is in a business similar to Premier's. He identified plaintiff's exhibit 1 and stated its purpose was to protect Fairfaxx and to keep former employees from going out and contacting their clients and contacting candidates. He testified he was aware of no instance in which Premier has competed with his company. He testified he was aware of one instance where Sarah Nickelson assisted Premier's Shelton office in placing a candidate at Warnaco, but that is of little significance because apparently Warnaco was also a client of Premier. It would be impossible for the court to conclude otherwise than that numerous temporary placement services call on large and small companies regularly to solicit their business or that large companies use more than one temporary services agency to meet their needs. Mr. Tucci admitted that their clients names are listed in the telephone book and industry publications. He could provide no evidence that the plaintiff lost any clients, candidates or money arising out of Ms. Nickelson's departure and her use of proprietary information.
Lastly, the plaintiff offered the deposition of Paul Schwabe, the CT Page 11156 President of Premier. The only real thing of significance was that he interviewed Ms. Nickelson once, was aware that she had an employment agreement with her prior employer Fairfaxx, asked to see it and eventually read it. He described it as "standard" but did not think it was a problem because Ms. Nickelson was changing market places. He did not recall whether he read the agreement before or after he employed Nickelson, and he did not discuss it with her. He did not believe she would be in violation of the agreement because she does not work in the markets where the plaintiff runs its business. He described her job initially as finding candidates in the Danbury area through public mediums, newspapers and job Lairs but not with finding clients. He further indicated that because she was not a sales person but a staffer and because of the change of location, she would not, in his opinion, be violating the agreement. He further confirmed that when he bought Temps, Inc. in 1998, which is now his Shelton office, they already had Warnaco as a client and that they had provided services and both temporary and permanent employees to Warnaco before Ms. Nickelson ever came to work for Premier.
To this complaint, the defendants have answered, denied any liability and have filed twelve special defenses. The court finds for the respective defendants on all three counts of the complaint for several reasons which will be set forth below.
Initially, reference is made to paragraphs 3, 4 and 6 of plaintiff's exhibit 1 which constitute the confidentiality and non compete clauses of the agreement which are set out as follows.
 3. NON-DISCLOSURE OF CONFIDENTIAL TRADE SECRET INFORMATION AND/OR TRADE SECRETS. EMPLOYEE understands that all records, materials, lists, and information obtained by EMPLOYEE in the course of employment with FAIRFAXX are confidential and trade secrets of FAIRFAXX and shall all remain the property and trade secrets of FAIRFAXX. During the course of his/her employment and after EMPLOYEE's employment with FAIRFAXX has ceased, EMPLOYEE will not disclose such confidential information and/or trade secrets, unless expressly authorized by an agent of FAIRFAXX in the furtherance of FAIRFAXX's business. EMPLOYEE will under no circumstances remove any books, records, documents or any information related to the business of FAIRFAXX whether such information be stored in or retrieved from a computer or otherwise without the written permission of FAIRFAXX. CT Page 11157
 4. RESTRICTIVE COVENANT. EMPLOYEE recognizes that FAIRFAXX will be directing EMPLOYEE's efforts to recruit Candidates and to solicit Clients throughout Fairfield and New Haven Counties in the state of Connecticut and Westchester and Putnam Counties in the state of New York, such areas being the location of Clients and Candidates of FAIRFAXX temporary Placement Service. EMPLOYEE further recognizes that he/she will meet or deal with Candidates and Clients of FAIRFAXX in these and other areas. Therefore, the EMPLOYEE:
 a. Agrees that due to his/her position, which encompasses, among other things, recruiting Candidates and soliciting Clients for the purpose of placing temporary employees throughout Fairfield and New Haven Counties in the state of Connecticut and Westchester and Putnam Counties in the state of New York, and his/her being given access to trade secrets and confidential information, his/her engaging in any business which is directly or indirectly competitive with FAIRFAXX will cause FAIRFAXX great and irreparable harm.
 b. Agrees that for two (2) years after the conclusion of his/her employment with FAIRFAXX, the EMPLOYEE shall not, directly or indirectly, on his/her own behalf or another's behalf, be employed by, own, manage, operate, control, participate in, or be associated in any manner with the ownership, management, operation or control of any company or business engaged in placement and recruitment of temporary employees anywhere within the markets referred to in Paragraph 4 of this Agreement.
 c. Agrees that for two (2) years after the conclusion of his/her employment he/she will not directly or indirectly solicit, contact, call upon, communicate with or attempt to communicate with any Client or Candidate of FAIRFAXX for the purpose of providing any services relating to temporary placement and recruitment. This restriction shall apply only CT Page 11158 to:
 i. any Client or Candidate of FAIRFAXX with whom the EMPLOYEE had contact during the last two (2) years of his/her employment with FAIRFAXX, or
 ii. any Client or Candidate of FAIRFAXX for which the EMPLOYEE has obtained confidential information, as defined by this Agreement, or trade secrets during the last two (2) years of his/her employment with FAIRFAXX.
 iii. For the purposes of this Paragraph, "contact" means interaction between the EMPLOYEE and the Client or Candidate which takes place to further the business relationship, or performing services for the customer, former customer or prospective customer on behalf of FAIRFAXX.
6. INJUNCTIVE RELIEF AND LIQUIDATED DAMAGES
 A. Specific Enforcement: EMPLOYEE hereby agrees with FAIRFAXX that damages may be an inadequate remedy to FAIRFAXX for any breach of the terms and conditions set forth in this Agreement, specifically including, but not limited to, the covenants contained in Paragraphs 3, 4 and 5 above and that in the event of a breach or threatened breach of this Agreement, FAIRFAXX may, with or without pursuing any remedy for damages, immediately see an injunction prohibiting EMPLOYEE from violating any of the terms of this Agreement.
 B. Liquidated Damages/Return of Gains/Costs: FAIRFAXX and EMPLOYEE acknowledge and agree that it may be difficult, if not impossible, to compute the remedy for damages, immediately see an injunction prohibiting EMPLOYEE from violating any of the terms of this Agreement.
 B. Liquidated Damages/Return of Gains/Costs: FAIRFAXX and EMPLOYEE acknowledge and agree that it may be difficult, if not impossible, CT Page 11159 to compute the actual damages that will be suffered by FAIRFAXX upon EMPLOYEE's violation of any of the covenants set forth in this Agreement. It is agreed, therefore, that during any period of time during which injunctive relief pursuant to Section 6A shall not have been obtained by FAIRFAXX and become effective against EMPLOYEE, EMPLOYEE shall pay to FAIRFAXX as liquidated damages, and not in the form of a penalty, THREE HUNDRED ($300.00) DOLLARS for each day in which EMPLOYEE shall be found to be in violation of any of the covenants set forth in this Agreement. EMPLOYEE further agrees that if EMPLOYEE breaches any of the covenants set forth in the Agreement, EMPLOYEE will immediately upon demand by FAIRFAXX account for and pay over to FAIRFAXX any compensation, commission, bonus, salary, gratuity, emolument, or other gain of any kind received directly or indirectly in any transaction or employment connected with such breach. In addition to the foregoing, EMPLOYEE agrees to pay all costs (including reasonable attorney's fees) incurred by FAIRFAXX in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement. This provision shall in no way limit FAIRFAXX's right to simultaneously seek and obtain injunctive relief as set forth in Section 6A.
Paragraph 6 of the Agreement sets forth the relief available to the plaintiff. In paragraph 6A it provides for injunctive relief, which the plaintiff is asking the court to order in the form of a temporary and permanent injunction restraining the defendant Nickelson from doing certain acts as set forth in its claim for relief on the first count. The court denies such relief because it finds the agreement unenforceable because 21 months of the two year restriction have already passed and since at least January 1, 2000, Nickelson's job at Premier in no way even remotely is comparable to what the plaintiff asks to enjoin her from doing. She now works in Pleasantville, New York at Readers Digest on a full time basis doing the in-house aspect of filling employment positions for them.
The first count of the plaintiff's complaint charges the individual defendant with breach of contract and has made specific factual claims CT Page 11160 which the court will test by the evidence. The court finds paragraph one to have been proven. As to the second paragraph, the defendant no longer lives in Fairfield, Connecticut but in Patterson, New York. Paragraph 3 has been proved. As to paragraph 4, the defendant actually went to work for the plaintiff as a temporary employee as a receptionist in March of 1997 and on May 5 became employed on a full time basis, not as a receptionist but as a personnel consultant. As to paragraph 5, not only was the defendant not promoted on December 9, 1997, but she had worked as a personnel consultant since May of 1997. Nothing at all changed on December 9, 1997, the reputed date of the contract at issue. As to paragraph 6, the plaintiff is again sadly mistaken about promotion and the time she became a personnel consultant, and the court further finds no agreement was entered into on December 9, 1997. Paragraphs seven and eight have been proven. As to paragraph 9, the plaintiff has failed to prove that allegation. As to paragraph lob and c, the plaintiff has offered no evidence at all to support those allegations. As to paragraph 10a, this court finds there was no enforceable confidentiality and non compete agreement, but to the extent some higher authority disagrees, she did go to work for a company in a similar business as alleged. The reasonableness of that clause under the specific facts of this case will be discussed subsequently.
As far as the contract itself, plaintiff's exhibit 1, it was obviously only signed and executed by the defendant and not the plaintiff. The agreement was obviously in writing, it was bilateral, it contained a signature block for someone on the part of the plaintiff to sign and Mr. Tucci, it's Vice President, testified that it was clearly contemplated that the plaintiff would and should have signed it. The plaintiff argues that despite this obvious flaw, its acceptance of the terms of the contract by continuing to employ the defendant overcame the lack of a signature.
The court is aware that generally signatures are not required to bind parties to a bilateral agreement. There are exceptions to this rule and one of them is where the parties themselves made the signatures essential to an enforcement of the contract. See 17A AmJur.2d § 185. The court concludes we have that situation here. In paragraph 13 on page 5 of exhibit 1 it states:
 COMPLETENESS OF AGREEMENT. This writing represents the entire Agreement between the parties hereto and no modification, alteration or amendment shall be deemed valid and binding unless in writing and signed by all the parties hereto. IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Agreement as of the date set forth below. (Emphasis CT Page 11161 added.)
The signature lines for Fairfaxx and for the defendant follow. That paragraph clearly states that no amendment or modification to exhibit 1 would be valid unless in writing and signed. The contract in question was in writing, had a signature block for the plaintiff and, according to Mr. Tucci, was contemplated to have been signed by the plaintiff. These facts coupled with the requirement of signing any amendment lead logically to the conclusion that this agreement itself, the defining document, needed to be signed. Finding no signature by the plaintiff, the court finds under these circumstances there was no enforceable agreement between the parties here.
In the event an appellate court disagrees with this conclusion, the court finds the agreement unenforceable because of a lack of consideration. It is of particular interest to the court that in the plaintiff's brief it now argues that the consideration was keeping the defendant employed or forebearing to fire her. They have pled in paragraph 5 and 6 of the First Count of the complaint that on December 9, 1997, the date of the so-called execution of plaintiff's exhibit 1, that on that day she was promoted to the position of personnel consultant. We know that is untrue. She was given that position in May of 1997. On December 9, 1997. nothing happened, no job change, no salary or benefit change. Fairfaxx knew this from the beginning, so why did it plead it. It pled it because it knew that consideration was necessary to make this agreement enforceable.
The plaintiff now cites several cases which simply do not support their legal position. Osborne Locke Steel Chain Co., 153 Conn. 527, 531
(1966), sets forth certain obvious contract principles:
 The doctrine of consideration is of course fundamental to the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. In defining the elements of the rule, we have stated that consideration consists of a benefit to the party promising or a detriment to the party to whom the promise is made. . . .
In Osborne the court specifically found that the plaintiff's promise in a written contract that he, as the defendant's former President and C.E.O., would hold himself available for advice and consultation for the rest of his life and would not work for any competitor for a promise of remuneration was valid consideration. The court concluded that the recited consideration constituted a benefit to the defendant as well as a detriment to the plaintiff and was therefore adequate consideration. CT Page 11162
The case of VanDyke Printing Co. v. DiNicola, 43 Conn. Sup. 191 at 195-6 (1993) is also instructive. In that case the defendant, who was an experienced printer, on March 11, 1968 went to work for the plaintiff in a wholly new line of work as a sales representative soliciting business. It was understood that there would be a written, signed contract which would provide protection to the plaintiff. That agreement, containing a non compete clause was signed four weeks later. The defendant worked for the plaintiff for 19 years, left and began selling for another company to clients of the plaintiff.
The defendant argued that an employee who has already commenced employment and receives no additional consideration for signing a covenant not to compete is not subject to the enforcement of the covenant because past consideration cannot support the imposition of a new obligation. Dick v. Dick, 167 Conn. 210, 224 (1974). The court in finding for the plaintiff stated that a contract containing a non compete agreement was understood from the beginning and because that clause and some other clauses concerning compensation had not been completely worked out yet, the agreement would be worked out in the near future. The court then distinguished the case of National Safe Northeast, Inc. v. Smith, Superior Court, judicial district of Hartford-New Britain at Hartford, docket number 304189 (December 3, 1985), in which an employee who had been working for one year was asked to sign a covenant not to compete as a condition of continued employment, a circumstance found to entail no new consideration for the new obligation and therefore unenforceable. That is exactly what we have here and there was no consideration.
The plaintiff further in its brief talks about a change of jobs and increases in salary in January of 1998. Neither of those was contemplated as of December 9, 1997 and could not be considered as consideration for the agreement of that day.
The plaintiff further cites the cases of Daniel v. Keane Agency, Inc.v. H. A. Butterworth, Jr., Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 313181 (February 22, 1995 Levin, J.) and RussoAssociates, Inc. v. Cachina, Superior Court, judicial district of Fairfield, Docket No. 276910 (1995), for the proposition that where the pre-existing contract of employment is terminable at will, no overt consideration is required to support an otherwise valid covenant not to compete. In both cases that proposition is merely dictum and had no relation to the actual finding and decision of the court.
In Keane, supra, the defendant went to work for Keane in 1988. By late 1992 he was complaining of an inadequate compensation and said he was getting new offers. On or about January 1, 1993, the parties entered into CT Page 11163 a new employment agreement that contained the restrictive covenant at issue as well as a new compensation package containing both larger commissions and larger bonuses. The defendant Butterworth argued the new agreement lacked consideration and the court held otherwise. It found by the more credible evidence that Keane did in fact provide new consideration for the restrictive covenant. Here there was none.
In Russo Associates, Inc., supra, the defendant Cachina was hired by the plaintiff in April, 1998 and was told then that he would have to execute an employment contract. On June 1, 1998, he executed an agreement containing a restrictive covenant. The defendant claims there was no consideration for the subsequently executed employment agreement and that argument was accepted by the attorney trial referee. In overturning that finding, the court held that the referee overlooked the temporal proximity between Cachina's hiring and his signing of the employment agreement. The court stated that he signed the agreement shortly after his employment, knew he would be required to sign one and therefore the consideration he got was his employment with the plaintiff. This is totally consistent with the finding in VanDyke Printing Co. v. DiNicola, supra. In this case there never was an original employment contract and none either required or contemplated.
In the event an appellate court disagrees with that finding, the court will go on to discuss the only clause in the agreement that is applicable to the facts in this case as well as the liquidated damages clause. In paragraph 4 of the plaintiff's exhibit 1, the defendant Nickelson agreed that for two years after the conclusion of her employment with the plaintiff that she would not be employed by any company or business engaged in placement and recruitment of temporary employees anywhere within the four county markets previously set forth. The agreement is restricted to temporary not full time employees.
In the liquidated damage clause, paragraph 6B of plaintiff's exhibit 1, after reciting that damages may be difficult to assess, the plaintiff provided two rights to itself: (1) to seek from Nickelson any compensation, commission, bonus, salary, gratuity, enrichment or other gain of any kind received by her or (2) liquidated damages of $300 per day. The plaintiff has never claimed nor sought anything under (1) above because there are none. No witness, exhibit or discovery document disclosed she did anything wrong or benefitted [benefited] in any way.
So the plaintiff is proceeding against Nickelson for the liquidated damages which, as of this date, would total nearly $200,000 for someone who was making a gross salary of about $25,000 yearly when she left the plaintiff's employ. CT Page 11164 This then requires an analysis of the law on this subject and its applicability to the special circumstances of a particular case.
 Therefore, a covenant that restricts the activities of an employee following the termination of his employment is valid and enforceable if the restraint is reasonable. Scott v. General Iron Welding Co., 171 Conn. 132, 137, 368 A.2d 111 (1976); New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 533, 559 A.2d 715 (1989). "The five factors to be considered in evaluating the employment agreement are: (1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of intereference with the public's interests. Scott v. General Iron Welding Co., 171 Conn. 132, 137, 368 A.2d 111 (1976); New Haven Tobacco Co. v. Perrelli, 18 Conn. App. 531, 533, 559 A.2d 715
(1989)." Robert S. Weiss Associates, Inc. v. Wiederlight, 208 Conn. 525, 529 n. 2, 546 A.2d 216
(1988). "The five prong test of Scott is disjunctive, rather than conjunctive; a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." New Haven Tobacco Co. v. Perrelli, supra, 534.
The court will now deal with (3) the fairness of the protection accorded to the employer and (4) the extent of the restraint on the employee's opportunity to pursue her occupation and the liquidated damages clause, all of which it finds unreasonable.
Before discussing these subjects, let the court reiterate that it has found not a scintilla of evidence that Nickelson shared or utilized information proprietary to the plaintiff in soliciting clients of Fairfaxx or disclosed proprietary information to anyone. The court is not even aware of what information the plaintiff is talking about other than names of companies that appeared in the telephone book. And remember, Nickelson was not in sales or even in the business of soliciting clients. Her job was to find a candidate to match up to the needs of a client. That she did by placing newspaper ads, interviewing candidates and recommending them to clients. Although the agreement talks of trade secrets, this court could find nothing resembling one.
On the subject of protecting the employer, the court in Keane v.CT Page 11165Butterworth, supra, stated:
 "In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment . . . should afford only a fair protection to the interest of the party in whose favor it is made. Scott v. General Iron Welding Co., supra, 171 Conn. 137. "[W]hen the character of the business and the nature of employment are such that the employer requires protection for his established business against competitive activities by one who has become familiar with it through employment therein, restrictions are valid when they appear to be reasonably necessary for the fair protection of the employer's business or rights."
The court has already described what Nickelson's job was at the plaintiff. Almost all of her commission's came from one client in Milford, Warnaco. While at Premier, she worked only a short time in that capacity, apparently generated no activity and for the last nine months she worked exclusively for Reader's Digest in New York state doing in-house work. She does no sales work. There is no evidence that Reader's Digest is or was ever a client of the plaintiff. The only evidence offered by the plaintiff was that Nickelson may have assisted Premiere's Shelton office in placing one two week temporary employee at Warnaco. That is of no significance because Warnaco was already a client of Premier by its purchase of Temp, Inc. in 1998.
Therefore, the court finds that this restriction preventing the defendant from working for two years for any company in the temporary employment business under the circumstance of this case where she has moved from Fairfield, Connecticut to Patterson, New York, has relocated her business location, where there is no proof that she is pursuing plaintiff's clients and where she is now employed in an area having nothing to do with the plaintiff's business is unreasonable. The plaintiff has failed to show that this restriction was reasonably necessary for the fair protection of its business.
On the subject of interference with the employee's employment, the court in Keane v. Butterworth, supra, stated:
 "The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from supporting himself and his family." Scott v. General Iron Welding Co., supra, 171 Conn. 137. CT Page 11166
Daniel v. Keane Agency, Inc. v. Butterworth, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 313181 (February 22, 1995).
The defendant Nickelson, barely out of college, got her first full time job at the plaintiff's in fulfilling their clients needs for temporary employees. When she was hired she signed no employment contract. They could fire her whenever they wanted. She was then literally forced to sign their restrictive covenants for which she got nothing.
The defendant then moved from Fairfield, Connecticut to Patterson, New York and was recruited and hired by Premier. She has not solicited the plaintiff's clients; she has not taken or utilized proprietary information; and she does nothing now to remotely damage the plaintiff financially. What she did for the plaintiff and, in fact, what she now does for the defendant Premier does not, in this court's opinion, even need the protection of these covenants. The court might feel differently if the defendant was in sales or client solicitation, but she was not. The court, on the basis of this prong of the test, finds the restriction in employment unreasonable in that it unnecessarily precludes her from supporting herself.
As far as the liquidated damage clause, the court finds that entirely unreasonable. Although in some cases it may be difficult to assess damages in cases of breaches of non compete and confidentiality agreements, it would not be here, because there was not any. Neither from its own records or Premieres or based on any other testimony has Fairfaxx shown one dollar of damages. To then entitle it to damages in excess of $200,000 is not only unreasonable but ridiculous.
As to the second count against Nickelson sounding in CUTPA, judgment may enter for the defendant as the plaintiff has totally failed to present evidence sustaining its burden of proof on the elements OF CUTPA. For CUTPA claims, the plaintiff must show that a person engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of a trade or business. Under CUTPA, the plaintiff is entitled to punitive damages when the evidence establishes that the defendant acted with a reckless indifference to the rights of others or with an intentional and wanton violation of those rights. Gargano v. Heyman,203 Conn. 616, 622 (1987). No evidence even remotely resembling that has been offered in this case.
The last count is against Premier and also sounds in CUTRA. The court will not restate the principles of law just enunciated. Presumably the claim is based on the fact that the president of Premier, Paul Schwabe, knew of and read plaintiff's exhibit 1 some time either just before or CT Page 11167 after his company hired her. He did not solicit her employment, never knew her before and she was presented by a recruiter. She was looking for a new job because of a major change of location of her residence. Schwabe did not think the contract was a problem because she was changing her residence, her market place, was not in sales but a staffer, and working in an area she had not worked in before.
Again the plaintiff fails sadly in presenting evidence to support its burden of proof set forth on the third count of the complaint and judgment may enter for the defendant Premier Staffing Services.
GORMLEY, J.